UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LEXINGTON FURNITURE INDUSTRIES, INC.
d/b/a LEXINGTON HOME BRANDS,

                        Plaintiff,                              19-cv-6239 (PKC)

         -against-                                    OPINION
                                                  <u>AND ORDER</u>

THE LEXINGTON COMPANY, AB d/b/a THE
LEXINGTON CLOTHING COMPANY,

                        Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        This trademark infringement action is part of an almost fifteen-year dispute over defendant's use of the term "Lexington."  Plaintiff Lexington Furniture Industries, Inc. ("LFI") describes itself as a "well-known and highly respected manufacturer, distributer and retailer of high-end furniture in the United States" who "offer[s] the most diverse range of styling within the industry."  (Pl. 56.1 ¶¶ 1–2).  For its part, defendant The Lexington Company, AB ("LCC") identifies as "a renowned global brand offering fashion apparel and certain home textiles" whose "style is based on the New England heritage, and combined with the Scandinavian design twist." (Def. 56.1 ¶¶ 8–9).  In 2007, LCC obtained a trademark registration for its "Lexington" mark consisting of a stylized American Flag with the term "Lexington" located where the stars would typically be.  Alarmed at the prospect of a competing "Lexington" mark, LFI filed a cancellation proceeding before the Trademark Trial and Appeal Board (the "TTAB"), and the parties engaged in discovery over the course of the next three years.  Ultimately, the TTAB ruled in LFI's favor and ordered LCC's mark to be cancelled.  In 2012, while the TTAB decision was on appeal, the parties reached a settlement (the "Settlement Agreement") that permitted LCC to use the term

"Lexington," in the United States, subject to certain restrictions.  Following seven years without litigation between the parties in the United States, LFI brought this action alleging trademark infringement and breach of the Settlement Agreement.

After the completion of discovery, the parties cross-moved for summary judgment on both the trademark infringement and breach of contract claims.  For reasons to be explained, LFI's motion for summary judgment will be denied.  LCC's motion will be granted in part as to the breach of contract claim and otherwise denied.

BACKGROUND

The facts below are undisputed except where otherwise noted.

A.  Overview of Plaintiff Lexington Furniture Industries, Inc.

LFI was founded in Lexington, North Carolina in the early 1900's and started using the name "Lexington" in 1964.  (Pl. 56.1 ¶¶ 1, 3; Def. 56.1 Resp. ¶¶ 1, 3; Def. 56.1 ¶ 67; Pl. 56.1 Resp. ¶ 67).[1]  In addition to furniture, LFI sells certain non-furniture products such as pillows, bedding and cut yardage for fabrics.  (Pl. 56.1 ¶¶ 34–37; Def. 56.1 Resp. ¶¶ 34–37).

As relevant to this action, LFI owns five federally registered trademarks that contain the word "Lexington" and cover certain types of furniture and furniture store services. (Pl. 56.1 ¶¶ 4–8; Def. 56.1 Resp. ¶¶ 4-8).  Specifically, LFI owns  (1) U.S. Reg. No. 1504866 for the word mark "Lexington"; (2) U.S. Reg. No. 4379049 for LEXINGTⓄN ; (3) U.S. Reg. No. 2684161 for the word mark "Lexington Home Brands"; (4) U.S. Reg. No. 4468729 for LEXINGTⓄN H O M E  B R A N D S ; and (5) U.S. Reg. No. 1576409 for the word mark "Lexington Furniture Industries."  (Id.)

---

[1] Citations to the parties' Rule 56.1 Statements are intended as a convenient reference to the evidence cited in those statements.

LFI uses the "Lexington Home Brands" mark as an "umbrella brand" that encompasses the company's six portfolio brands.  (Stamper Decl. ¶ 11).  These portfolio brands are the "flagship" Lexington brand, Artistica Home, Sligh, Tommy Bahama Home, Tommy Bamaha Outdoor Living and Barclay Butera.  (Stamper Decl. ¶ 11; Stamper Tr. 23).

LFI uses the "Lexington" and "Lexington Home Brands" marks to market and sell products through its website, social media sites, print advertisements and in its authorized dealers' showrooms.  (Pl. 56.1 ¶¶ 16–22, 27–33; Def. 56.1 Resp. ¶¶ 16–22, 27–33).  Sometimes the "Lexington" mark will be used with a collection name, such as "Avondale" or "Carlyle." (See, e.g., Pl. 56.1 ¶ 27; Def. 56.1 Resp. ¶ 27).

LFI sells its products in a variety of ways.  It operates two "Tommy Bahama" branded retail stores, showrooms in Manhattan and Denver and participates in various furniture markets.  (Def 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 42).  Consumers can also purchase LFI's products through authorized, third-party retailers both at their physical locations and online.  (Pl. 56.1 ¶¶ 16, 129; Def. 56.1 Resp ¶¶ 16, 129; Def 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 42).

B.  Overview of Defendant The Lexington Company, AB.

LCC was founded in 1997 in Stockholm, Sweden.  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7).  As part of LCC's "home textile" collection, it sells duvets, pillowcases, pillows, sheets, bedspreads, blankets, bathrobes, pajamas, table linen, kitchen towels and aprons.  (Pl. 56.1 ¶ 47; Def. 56.1 ¶ 47).  LCC sells clothing, but it does not sell furniture.  (Def 56.1 ¶¶ 10, 96; Pl. 56.1 Resp. ¶¶ 10, 96).

LCC sells its products primarily in Europe and Asia.  (Pl. 56.1 ¶ 45; Def. 56.1 ¶ 45; Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11).  It entered the United States market in 2012.  (Def. 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12).  LCC markets and sells its products to consumers in the United States,

using the terms "Lexington Company," "Lexington" and the Lexington Flag Logo (the "Flag Logo").  (Pl. 56.1 ¶¶ 79–83; Def. 56.1 Resp. ¶¶ 79–83).  More specifically, LCC uses the Flag Logo together with the word "Lexington" in a variety of contexts, including its social media sites, email newsletters and on bags and packaging given to consumers when purchasing LCC's products.  (Pl. 56.1 ¶¶ 87–92, 104–05, 112; Def. 56.1 Resp. ¶¶ 87–92, 104–05, 112).  It also uses the mark "Lexington Clothing Co." in the United States.  (Def. 56.1 ¶ 121; Pl. 56.1 Resp. ¶ 121).

LCC previously operated three brick-and-mortar stores in the United States.  (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16).  These stores all closed between 2016 and 2019 due to a lack of profitability.  (Def. 56.1 ¶¶ 17–20; Pl. 56.1 Resp. ¶¶ 17–20).  LCC has no current plans to open a store in the United States.  (Def. 56.1 ¶ 21; Pl. 56.1 Resp. ¶ 21).  It continues to sell its products in the United States through its United States facing website.  (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 24).

C.   Prior Litigation and Procedural History.

On March 20, 2007, LCC obtained a U.S. trademark registration for its Flag Logo, Reg. No. 3220226 (the " '226 Registration") covering household linens.  (Def. 56.1 ¶ 48; Pl. 56.1 Resp. ¶ 48).  LFI subsequently filed a petition to cancel the '226 Registration with the TTAB.  (Pl. 56.1 ¶ 55; Def. 56.1 Resp. ¶ 55).  On June 22, 2011, the TTAB issued a decision in favor of LFI and ordered the '226 Registration canceled.  (Pl. 56.1 ¶ 62; Def. 56.1 Resp. ¶ 62).

LCC appealed the TTAB's decision to the United States Court of Appeals for the Federal Circuit.  (Def. 56.1 ¶ 56; Pl. 56.1 Resp. ¶ 56).  On January 12, 2012, prior to a decision on the appeal, the parties entered into the Settlement Agreement.  (Def. 56.1 ¶ 57; Pl. 56.1 Resp.

¶ 57).  The Federal Circuit subsequently granted the parties' joint motion to dismiss the appeal. (Def. 56.1 ¶ 59; Pl. 56.1 Resp. ¶ 59).

On July 8, 2019, LFI filed the current action.  It now moves for partial summary judgment as to its claims under the Lanham Act and New York law for trademark infringement and unfair competition (Counts I-II and VII-VIII) and for breach of contract based on breach of the Settlement Agreement (Count VI).  (Doc 81).  LCC cross-moves for partial summary judgment with respect to those same claims.  (Doc 93).

LCC'S MOTION TO STRIKE

In connection with LCC's cross-motion for summary judgment, it also moves to strike certain evidence submitted by LFI.  (Doc 108).  Specifically, LCC requests that the Court exclude as evidence the entirety of Robert Stamper's Response Declaration and the sixteen exhibits attached to this declaration.  (Doc 104).  LCC contends that LFI failed to timely produce these exhibits during discovery and therefore they should not be considered on summary judgment.  For reasons that will be explained, the Court concludes that there are genuine disputes of material fact precluding summary judgment without the need to consider the Stamper Response Declaration and attached exhibits.  Accordingly, LCC's motion to strike will be denied as moot.

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could

5

return a verdict for the nonmoving party.' " Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (internal quotation marks omitted).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres., 575 F.3d at 204 (internal citations omitted).

6

DISCUSSION

> I.    Neither Party Is Entitled to Summary Judgment on LFI's Trademark
>       <u>Infringement Claims.</u>

Counts I and II assert claims under the Lanham Act for trademark infringement, 15 U.S.C. § 1114, and for unfair competition and false designation of origin, 15 U.S.C. § 1125(a).  LFI also brings claims of common law trademark infringement (Count VII) and unfair competition (Count VIII) under New York law.

The parties agree that the trademark infringement claims all turn on whether LFI can establish a likelihood of consumer confusion under the Lanham Act.  <u>See</u>, <u>e.g.</u>, <u>OffWhite Prods., LLC v. Off-White LLC</u>, 480 F. Supp. 3d 558, 563 (S.D.N.Y. 2020) (Engelmayer, J.) (noting that the <u>prima facie</u> case required for Lanham Act claims under 15 U.S.C §§ 1114(1) and 1125(a)(1)(A) is the same); <u>Smith v. Mikki More, LLC</u>, 59 F. Supp. 3d 595, 616 (S.D.N.Y. 2014) (Cote, J.) (internal quotation marks and alterations omitted) ("A claim of trademark infringement under New York law requires proof of the same elements and can be analyzed together with a Lanham Act claim."); <u>Giggle, Inc. v. netFocal, Inc.</u>, 856 F. Supp. 2d 625, 647 (S.D.N.Y. 2012) (Jones, J.) ("Unfair competition under New York Law shares most of the same elements as a claim for trademark infringement under the Lanham Act.").

> A.  <u>Legal Standard for Trademark Infringement.</u>

"Under the Lanham Act, a plaintiff alleging trademark infringement must demonstrate that (1) 'it has a valid mark that is entitled to protection' and that (2) the defendant's 'actions are likely to cause confusion with [that] mark.' " <u>Tiffany & Co. v. Costco Wholesale Corp.</u>, 971 F.3d 74, 84 (2d Cir. 2020) (quoting <u>The Sports Auth., Inc. v. Prime Hospitality Corp.</u>, 89 F.3d 955, 960 (2d Cir. 1996)).

The registration of a trademark is "prima facie evidence of the validity of the registered mark . . . ." 15 U.S.C. § 1115(a). "A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp., 991 F.2d 1072, 1076 (2d Cir. 1993) (citing 15 U.S.C. § 1065). LCC does not dispute that Lexington's registered marks are valid and have become incontestable. (Pl. 56.1 ¶¶ 4–8; Def. 56.1 Resp. ¶¶ 4-8). Accordingly, the Court concludes that LFI's "Lexington" marks are valid and entitled to protection as a matter of law. See Savin Corp. v. Savin Group, 391 F.3d 439, 456 (2d Cir. 2004).

The ultimate issue on the Lanham Act claims concerns whether LCC's use of Lexington-formative marks is likely to cause consumer confusion. To establish a likelihood of confusion, consumers need not believe that LCC's and LFI's products are from the same source. See Tiffany & Co., 971 F.3d at 84. Rather a belief that LFI "'sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.' " Star Indus., Inc. v. Bacardi & Co., Ltd., 412 F.3d 373, 383–84 (2d Cir. 2005) (quoting Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204–05 (2d Cir.1979)).

In determining whether there is consumer confusion, courts look to the familiar "Polaroid factors" first set forth in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). See, e.g., Car-Freshner Corp. v. Am. Covers, LLC, 980 F.3d 314, 327 (2d Cir. 2020). The Polaroid factors are "(1) the strength of the mark, (2) the similarity of the two marks, (3) the proximity of the products, (4) actual confusion, (5) the likelihood of plaintiff's bridging the gap, (6) defendant's good faith in adopting its mark, (7) the quality of defendant's products, and (8)

the sophistication of the consumers."  Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454

F.3d 108, 116 (2d Cir. 2006).

### B.  The TTAB Decision Does Not Give Rise to Issue Preclusion.

As a threshold matter, LFI argues that collateral estoppel or issue preclusion

should bar LCC from litigating whether its "Lexington" marks cause consumer confusion.  On

March 20, 2007, LCC obtained a U.S. trademark registration for its Flag Logo, the '226

Registration, in connection with "bath linen; bed clothes, namely, pillow shams, bed covers, bed

spreads, blankets, sheets, pillow cases, mattress covers; bed linen; handkerchiefs; household

linen; table linen; cloth coasters; curtains; textile place mats; textile napkins; [and] towels."

(TTAB Order, at 1–2).  Thereafter, LFI filed a petition to cancel the '226 Registration with the

TTAB.  On June 22, 2011, the TTAB determined that there was a likelihood of confusion

between the '226 Registration and three of LFI's marks at issue in this action.  (TTAB Order, at

1–4).  Specifically, the TTAB found that "because the marks are similar, the goods are related

and the goods move in the same channels of trade and are sold to the same classes of consumers,

[LCC's] mark LEXINGTON and design for household linens so resembles [LFI's]

LEXINGTON marks for furniture as to be likely to cause confusion."  (Id. at 28).

As a general matter, issue preclusion "applies when (1) the issues in both

proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually

decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the

issues previously litigated were necessary to support a valid and final judgment on the merits."

Ali v. Mukasey, 529 F.3d 478, 489 (2d Cir. 2008) (internal quotation marks omitted).  In B&B

Hardware, Inc. v. Hargis Indus., Inc., the Supreme Court addressed the preclusive effect of

TTAB decisions in subsequent actions for trademark infringement under the Lanham Act.  575

U.S. 138 (2015); see also Cesari S.r.L. v. Peju Province Winery L.P., 17-cv-873, 2017 WL 6509004, at *3–4 (S.D.N.Y. Dec. 11, 2017) (Buchwald, J.) (giving preclusive effect to a TTAB opposition proceeding determination on the likelihood of confusion between two marks in an action for trademark infringement).  In the context of trademark infringement actions, "[s]o long as the other ordinary elements of issue preclusion are met, when the usages adjudicated by the TTAB are materially the same as those before the district court, issue preclusion should apply." B&B Hardware, 575 U.S. at 160.  "[I]f the TTAB does not consider the marketplace usage of the parties' marks, the TTAB's decision should 'have no later preclusive effect in a suit where actual usage in the marketplace is the paramount issue.'" Id. at 156–57 (quoting McCarthy on Trademarks and Unfair Competition § 32:101).  However, "trivial variations between the usages" adjudicated before the TTAB "and the use of a mark in the marketplace do not create different 'issues' . . . ." Id.

The Court concludes that issue preclusion does not apply to the TTAB's adjudication regarding the likelihood of consumer confusion between the parties' mark.  LCC did not enter the United States' market until after the TTAB's decision was issued and the Settlement Agreement was executed.  (Pl. 56.1 ¶ 77; Def. 56.1 Resp. ¶ 77; Def. 56.1 ¶ 12; Pl. 56.1 Resp ¶ 12).  Therefore, all of the marketplace usage at issue here occurred after the TTAB's decision.  (Def. 56.1 ¶ 66; Pl. 56.1 Resp. ¶ 66).  As discussed more fully in the next section, whether there is a likelihood of confusion in this action depends considerably on the actual marketplace usage of both LFI's and LCC's marks.  With respect to the factor of similarity between the two marks, the Court considers the context in which the marks are used.  See Star Indus., 412 F.3d at 386.  LFI urges that there is consumer confusion in part due to the actual use of LCC's "Lexington" marks on its social media and website, in advertisements and on product

packaging.  None of these uses were the focus of the TTAB's decision.  LCC has also put forth

evidence that could weigh against a finding that the marks are similar due to LFI using its

"Lexington" marks in conjunction with a brand or collection name in the marketplace.  Next, the

proximity of the products factor depends in part on whether the parties have been competitors

and have sold products in the same relevant market during the period of alleged infringement.

Lastly, a reasonable jury could find that the factor of actual confusion in the marketplace weighs

in favor of LFI or LCC.  Because the issues in this case turn on actual marketplace usage not

considered by the TTAB, issue preclusion does not apply.  See B&B Hardware, 575 U.S. at 154

("[F]or a great many registration decisions issue preclusion obviously will not apply because the

ordinary elements will not be met.").

### C.  Weighing Consumer Confusion under the Polaroid Factors

"The application of the Polaroid test is 'not mechanical, but rather, focuses on the

ultimate question of whether, looking at the products in their totality, consumers are likely to be

confused.' "  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009)

(quoting Star Indus., 412 F.3d at 384).  The Polaroid test "is a fact-intensive inquiry that depends

greatly on the particulars of each case," and no single factor is determinative.  Kelly-Brown v.

Winfrey, 717 F.3d 295, 307 (2d Cir. 2013); see Car-Freshner Corp., 980 F.3d at 334 ("With

some factors favoring each side, we encounter a question as to which Polaroid provides no

guidance: how are conclusions at to the eight factors to be considered in the aggregate when

some favor each party?").

In Tiffany & Co. v. Costco Wholesale Corp., the Second Circuit recently

observed that "some of [its prior] cases have been purported to afford considerable deference" to

a district court's "findings" at the summary judgment stage "with respect to predicate facts

underlying each Polaroid factor, or even to its finding on each factor generally."  971 F.3d at 85

(internal quotation marks and citation omitted).  However, "[t]hese cases should not be read to suggest that 'a district court deciding a motion for summary judgment in a trademark infringement case has . . . greater discretion than it would have in a non-trademark case to resolve disputed issues of fact or draw inferences against the non-moving party.' " Id. (quoting Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 216 (2d Cir. 2003), abrogated on other grounds by 4 Pillar Dynasty LLC v. N.Y. & Co., 933 F.3d 202 (2d Cir. 2019)).  "As in any other area of law, then, '[i]f a factual inference must be drawn to arrive at a particular finding on a Polaroid factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment.' " Id. at 86 (quoting Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 478 (2d Cir. 1996)).

　　　　　The Court concludes that there are triable questions as to several of the Polaroid factors.  Even though certain factors might weigh in a party's favor on the record at summary judgment, since there must be a trial to determine disputed factual issues, it is preferable that the weighing of factors and ultimate conclusion be made on a full record at trial.

　　　　　To show why summary judgment is not appropriate, the Court will briefly discuss three of the Polaroid factors: (1) strength of mark (2) similarity of the marks and (3) competitive proximity.

### 1.   Strength of Mark

　　　　　A mark's strength "is analyzed based on two components: (1) the degree to which the mark is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." Car-Freshner Corp., 980 F.3d at 329 (internal quotation marks and alteration omitted); see also McCarthy on Trademarks § 11.80 (5th ed.) (describing the two components as "conceptual strength" and "commercial strength").  To determine inherent distinctiveness,

"[m]arks are classified, in ascending order of strength" as (1) generic, (2) descriptive, (3) suggestive or (4) arbitrary or fanciful.  Star Indus., 412 F.3d at 384–85.  Marks in the last two categories are considered "inherently distinct."  Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 (2d Cir. 1997).

      LFI urges that since the "Lexington" marks are registered and have become incontestable, the Court need not further analyze their inherent distinctiveness.  But even for marks that have reached incontestable status "independent indicia of strength is relevant to deciding . . . the strength of the mark" under the Polaroid factors.  The Sports Auth., 89 F.3d at 961; see also Saxon Glass Tech., Inc. v. Apple Inc., 824 Fed. App'x 75, 79 & n.3 (2d Cir. 2020) (citing Gruner + Jahr, 991 F.2d at 1078) ("Although Saxon's IONEX mark was granted incontestable status under 15 U.S.C. § 1065, this Court may nonetheless find the mark to be weak."); Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc., 307 F. Supp. 3d 260, 288 (S.D.N.Y. 2018) (Nathan, J.).

      Conceptually, LCC urges that the "Lexington" marks are geographically descriptive and therefore not inherently distinctive.  A geographically descriptive term or phrase is one that "'designates geographical location and would tend to be regarded by buyers as descriptive of the geographic location of origin of the goods or services.' "  Forschner Group, Inc. v. Arrow Trading Co. Inc., 30 F.3d 348, 353 (2d Cir. 1994) (quoting McCarthy on Trademarks § 14.02).  It is undisputed that LFI was founded in Lexington, North Carolina.  (Def. 56.1 ¶ 67; Pl. 56.1 Resp. ¶ 67).  LFI's Senior Vice President of Marketing, Robert Stamper testified that LFI uses "Lexington" in its name "[b]ecause the company was founded in the city of Lexington, and we still have a very large factory in the city."  (Stamper Tr. 30).  He answered affirmatively when asked whether "the name was chosen because that's where the furniture was

made." (Id.)  Moreover, Mr. Stamper testified that North Carolina is "famous for furniture because initially there [was] a really abundant supply of good hardwood, and there [was] an abundant supply of good labor." (Id. at 50).  In opposition, LFI primarily argues that its marks are not geographically descriptive because there is no evidence that consumers associate LFI's furniture with the city of Lexington, North Carolina.  While not material to the Court's summary judgment decision, it takes judicial notice that another famous brand of furniture, "Thomasville," manufactured by Thomasville Furniture Industries, was historically made in Thomasville, North Carolina, 11 miles from Lexington, North Carolina.

With respect to the second component of the "strength" analysis, acquired distinctiveness or secondary meaning, the Court is mindful that "'[t]he careful weighing of evidence necessary to determining secondary meaning renders it an unlikely candidate for summary judgment.'" Classic Liquor Importers, Ltd. v. Spirits Int'l B.V., 201 F. Supp. 3d 428, 445 (S.D.N.Y. 2016) (Rakoff, J.) (quoting Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 169 (2d Cir.1991)).  To determine secondary meaning, courts analyze six factors: "advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." Car-Freshner, Corp., 980 F.3d at 329.

Here, there are genuine disputes of material fact regarding the commercial strength of LfI's "Lexington" marks.   It is undisputed that LFI has used the marks to sell furniture since the 1960's.  (Pl. 56.1 ¶ 3; Def. 56.1 Resp. ¶ 3).  According to Mr. Stamper, LFI has spent "tens of millions of dollars" in advertising using the "Lexington" marks and has sold over a billion dollars' worth of goods under the marks in the last ten years.  (Stamper Decl. ¶¶ 6, 9).  The record on summary judgment shows instances of LFI advertising in magazines such as

Luxe Interior, Architectural Digest and Traditional Home.  (Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10).

LFI has also submitted evidence of partnerships in which it provides furniture for ABC's

Extreme Makeover: Home Edition and NBC's Today Show.  (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶

11).

       In opposition, LCC argues that LFI has provided no support for its advertising

expenses, revenue figures or claims that any media coverage was unpaid other than Mr.

Stamper's declaration.  See Tiffany & Co., 971 F.3d 74 ("[T]he weight to be given to a particular

piece of evidence can be determinative of whether the moving party is entitled to summary

judgment or whether a jury could find a material fact favorable to the non-moving party.").  LCC

further points to LFI's failure to submit consumer survey evidence on whether consumers

associate the "Lexington" marks with LFI.  Lastly, LCC identifies 68 third-party trademark

registrations that incorporate the term "Lexington."  However, the Court notes that the vast

majority of these marks do not pertain to furniture or home linens.  See Lexington Mgmt. Corp.

v. Lexington Cap. Partners, 10 F. Supp. 2d 271, 281 (S.D.N.Y. 1998) (Preska, J.) (quoting

Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1174 (2d Cir. 1976) ("[T]hird-party

use has less effect where the third-party marks are used to promote 'entirely unrelated

products.'").

       2.  Similarity of the Marks

       In assessing this factor, a court considers "(1) whether the similarity between the

two marks is likely to cause confusion and (2) what effect the similarity has upon prospective

purchasers."  The Sports Auth., 89 F.3d at 962.  To determine similarity, "'courts look to the

overall impression created by the logos and the context in which they are found and consider the

totality of factors that could cause confusion among prospective purchasers.' " Star Indus., 412

F.3d at 386 (quoting Gruner + Jahr, 991 F.2d at 1078).

LCC urges that the marks are not similar because it does not use the terms

"Lexington" or "Lexington Company" alone but in conjunction with the Flag Logo.  The

evidence in the record appears to support LCC's assertion that it does not use the terms

"Lexington" or "Lexington Company" standing alone.  (See generally Pl. 56.1 ¶¶ 87–95, 105,

112–13, 117; Def 56.1 Resp. ¶¶ 87–95, 105, 112–13, 117).

However, the Court's consideration of similarity "begins with the words of the

marks." Car-Freshner Corp, 980 F.3d at 330.  "Lexington" is the first or sole word in each of

LFI's marks.  The term "Lexington" is similarly contained within LCC's Flag Logo.  Moreover,

the context in which both parties use their Lexington-formative marks is similar.  This includes

the use of "Lexington" marks in print advertisements, product showrooms and on websites and

social media accounts.  (Compare Pl. 56.1 ¶¶ 87–95, 105, 112–13, 117; Def 56.1 Resp. ¶¶ 87–95,

105, 112–13, 117, with Pl. 56.1 ¶¶ 87–92, 104–05, 112; Def 56.1 Resp. ¶¶ 87–92, 104–05, 112).

An additional factual dispute results from LFI selling its products using six

different brands names and various collection names.  The evidence in the record shows that LFI

uses its "Lexington" marks in conjunction with a brand or collection name.  (See, e.g., Pl. 56.1 ¶

15; Def. 56.1 Resp ¶ 15; Def 56.1 ¶ 78; Pl. 56.1 Resp. ¶ 78).  The Second Circuit has "repeatedly

found that the presence of a distinct brand [or company] name may weigh against a finding of

confusing similarity." Playtex Prods., Inc. v. Georgia-Pac. Corp., 390 F.3d 158, 164–65 (2d Cir.

2004), superseded on other grounds as recognized in Starbucks Corp., 588 F.3d at 107–08.  But

it "has also held that, in some circumstances, 'the addition of a trade name does not necessarily

alleviate the problem of confusion of marks, and indeed, can aggravate it, as a purchaser could

well think plaintiff had licensed defendant as a second user.' " Id. (quoting Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 395 (2d Cir. 1995)).  Accordingly, a reasonable jury could reach different conclusions regarding the similarity of the marks.

### 3.   The Proximity of the Products

The third Polaroid factor, the proximity of the products, applies "to both the subject matter of commerce in which the two parties engage and the geographic areas in which they operate."  Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 39 (2d Cir. 2016). "In assessing this factor, 'the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal.' "  Savin Corp., 391 F.3d at 459 (quoting W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir.1993)).  "[D]irect competition between the products is not a prerequisite to relief," but "products that share the same channel of trade are not necessarily proximate."  The Sports Auth., 89 F.3d at 963 (internal quotation marks omitted).

The parties dispute whether they should be considered competitors and the extent to which their product offerings overlap.  When asked at his deposition, Mr. Stamper did not identify LCC as one of LFI's primary competitors.  (Stamper Tr. 132–34).  LCC also points to the deposition of its Chief Operations Officer and Chairman of the Board, Tommy Lindhe, who testified that LFI is "not a competitor of ours.  We don't sell the same things.  We sell textiles, and they sell furniture."  (Lindhe Tr. 79–80).

However, LFI urges on summary judgment that the parties are competitors because they both sell pillows and bedding in the United States.  There is a genuine dispute of material fact regarding the extent to which each party sells pillows, bedding and other home textiles.  Mr. Lindhe stated that about 55 percent of LCC's global business is home textiles and

45 percent is apparel. (Lindhe Tr. 31). However, he testified that the majority of LCC's sales in the United States are for apparel and not "home" products. (Lindhe Tr. at 35). The record contains LCC's net sales from 2014 to 2018. During that period, over two-thirds of LCC's web sales were home textiles but the majority of LCC's sales in its now-closed brick-and-mortar stores were clothing. (Doc 105 – Ex. 4). With respect to LFI, Mr. Stamper testified that it does not "make" anything other than furniture. (Stamper Tr. 31, 69). But he also stated that LFI "sells" other products that overlap with LCC's products such as pillows and cut yardage for fabric that is used to make bedding and drapes. (Stamper Tr. 69–70; 158–61). LFI sets forth evidence that from 2015 to 2019, it had $2.24 million in sales of "accent pillows" and $3.91 million in sales of cut yardage. (Doc 96 – Ex. AA). LCC urges that such sales of pillows and cut yardage were only a small percentage of LFI's total sales and that there is no evidence showing whether the cut yardage sold was actually in connection with home textiles. (See Doc. 96 – Ex. L).

Even if the parties are not considered competitors, a reasonable jury could find that the proximity factors weighs in LFI's favor due to the complimentary nature of LFI's furniture products and LCC's home products. See, e.g., Virgin Enterprises Ltd. v. Nawab, 335 F.3d 141, 150 (2d Cir. 2003). It is undisputed that LFI and its authorized dealers display bedding, pillows and other accessories when marketing LFI's furniture products. (Pl. 56.1 ¶¶ 123–25; Def. 56.1 ¶¶ 123–25). Moreover, LFI sets forth evidence showing that third-party companies sell both furniture and home textiles including pillows, bedding and other home linens. (Pl. 56.1 ¶¶ 126–27; Def. 56.1 Resp. ¶¶ 126–27).

4.   The Remaining Polaroid Factors and Balancing of Factors

The fourth factor, bridging the gap, is likely "irrelevant" because LFI is already using its marks, at least to some extent, in the same subject matter area and geographic area as LCC.  See Car-Freshner Corp., 980 F.3d at 332.  The next factor, actual confusion, also cannot be determined as a matter of law.  Although LFI points to some instances of actual confusion, see generally Pl. 56.1 ¶¶ 132–147, it is not of a nature that would permit this Court to grant LFI judgment as a matter of law.  Moreover, LCC points to the absence of survey evidence on the issue of actual confusion.  See The Sports Auth., 89 F.3d at 964 ("Although the absence of surveys is evidence that actual confusion cannot be shown, . . . a trier of fact may still conclude that actual confusion exists in the absence of such evidence, so long as there is other evidence of actual confusion.").  As to LCC's bad faith in adopting the mark, the Second Circuit has "consistently observed, 'subjective issues such as good faith are singularly inappropriate for determination on summary judgment.' "  Tiffany & Co., 971 F.3d at 88 (quoting Cadbury, 73 F.3d at 483).  A determination regarding LCC's good faith cannot be made on the record before this Court.  Regarding the final two factors, the quality of products and sophistication of consumers, the parties agree that their products are of similar quality and target high-end or affluent consumers.  (Pl. 56.1 ¶ 14; Def 56.1 Resp. ¶ 14; Def. 56.1 ¶ 112; Pl. 56.1 Resp. ¶ 112).  Neither of these factors materially influence the likelihood of confusion analysis on summary judgment.

On the present record, reasonable juries could reach different conclusions on "the ultimate issue of whether [LCC's] action generated a likelihood of customer confusion."  Tiffany & Co., 971 F.3d at 86 (denying summary judgment where reasonable triers of fact could reach a different conclusion on three Polaroid factors: actual confusion, defendant's good faith and consumer sophistication); Car-Freshner Corp., 980 F.3d at 334 ("The balance of all the Polaroid

factors favors CFC at least sufficiently to preclude summary judgment for Energizer as to infringement of the 'Black Ice' mark.").  The parties cross-motions on LFI's trademark infringement claims will be denied.

      II.    <u>Breach of the Settlement Agreement.</u>

      The parties agree that New York law applies to LFI's claim for breach of the Settlement Agreement.  Under New York law, a plaintiff must prove "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." <u>Second Source Funding, LLC v. Yellowstone Capital, LLC</u>, 144 A.D.3d 445, 445–46 (1st Dep't 2016); <u>see</u> <u>also</u> <u>Johnson v. Nextel Commc'ns, Inc.</u>, 660 F.3d 131, 142 (2d Cir. 2011).

      "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 157–58 (2d Cir. 2000). But "'the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary.' " <u>Id.</u> (quoting <u>3Com Corp. v. Banco do Brasil, S.A.</u>, 171 F.3d 739, 746–47 (2d Cir. 1999)).

      The elements regarding the existence of a contract and LFI's performance thereunder are not in dispute.  The parties' cross-motions for summary judgment contest whether LCC breached four provisions of the Settlement Agreement.  The first two provisions at issue concern the "intent" of the Settlement Agreement:

> The intent of this Agreement is for The Lexington Company, AB ("Home") to use the term "Lexington Clothing Co." ("LCC") in the U.S. marketing and sales of its home textile line as the primary identifier of those goods, and to permit it to use the mark that is the subject of the cancellation proceeding from which the appeal is taken ("the flag logo") on the goods subject to the limitations below, so as to eliminate potential

confusion that Home's goods are those of Lexington Furniture Industries, Inc's ("Furniture")  or are licensed or approved by Furniture.

(Settlement Agreement, at 1).  Similarly, paragraph 11 provides that "Home shall use LCC in all U.S. targeted advertising in a manner consistent with the intent of this agreement."  (Id.)

LFI urges that LCC breached these provisions by using "Lexington" marks other than the term "Lexington Clothing Company."  In response, LCC argues that the Settlement Agreement permits it to use terms such as "Lexington," "Lexington Company" or the Lexington Flag Logo, so long as the "primary identifier" of LCC's goods in the United States is the "Lexington Clothing Company."

The Court concludes that the plain language of the Settlement Agreement makes clear that the parties intended LCC to use "Lexington Clothing Company" as the "primary identifier," but not the sole or exclusive identifier for its home textile products in the United States.  Although the Settlement Agreement restricts the use of the Lexington Flag Logo "on the goods" of LCC, it does not restrict the use of the Flag Logo in advertising other than requiring such United States' targeted advertising be done "in a manner consistent with the intent of the agreement."  (Settlement Agreement ¶ 11).  Construing this provision in the context of the entire agreement, LCC is only required to use "Lexington Clothing Company" as its "primary identifier" when advertising home textile products in the United States.

But the Court's construction of these provisions does not settle the question of breach.  On this record, the Court finds a genuine dispute of material fact as to whether LCC used "Lexington Clothing Company" as the "primary identifier" of its home textile products in the United States.  LCC has set forth evidence that it advertises certain of its products using the "Lexington Clothing Company" mark.  (Def. 56.1 ¶¶ 121–32; Pl. 56.1 Resp. ¶¶ 121–32).  But as discussed in connection with LFI's Lanham Act claims, there is also evidence that shows LCC

21

used "Lexington" or "Lexington Company" in conjunction with the Flag Logo.  (See generally Pl. 56.1 ¶¶ 87–95, 105, 112–13, 117; Def 56.1 Resp. ¶¶ 87–95, 105, 112–13, 117).

Second, LFI argues that LCC breached the Settlement Agreement by advertising and selling products through third-party online retailer Perigold.com.  It urges such activity violates the prohibition that LCC "shall not market in 'dedicated home stores,' or furniture stores."  (Settlement Agreement ¶ 3).  Even if LCC's activity on Perigold.com constituted a breach, it was cured consistent with the terms of the Settlement Agreement.  Paragraph 10 of the Settlement Agreement provides that "[i]f either party believes that either has breached any of the above terms it shall give notice of breach and provide 60 days to cure."

It is undisputed that LCC marketed goods on Perigold.com for only a month or two.  (Def. 56.1 ¶ 148; Pl. 56.1 Resp. ¶ 148).  On February 19, 2019, LFI sent a cease-and-desist letter objecting to LCC's use of Perigold.com.  (Def. 56.1 ¶ 149; Pl. 56.1 Resp. ¶ 149).  LCC responded on February 28, 2019 stating that its use of "Perigold.com was merely a mistake or oversight, rather than a conscious effort to breach the US Agreement."  (Doc 96 – Ex. N).  The letter further confirmed that LCC was "actively working with Perigold.com to ensure that any remaining products are removed from the Perigold.com website at this time."  (Id.)  LFI responded on March 21, 2019, stating that "[a]lthough we appreciate your client's efforts to have its products removed from the Perigold.com website, we note that LCC has refused" to remedy other alleged breaches.  (Id.)  In response to LCC's motion, LFI has failed to come forward with evidence, which if believed, would permit a reasonable factfinder to conclude that LCC marketed it goods on Perigold.com beyond the 60-day cure period.

Lastly, LFI urges that LCC breached the provision in which it "agree[d] not to participate or exhibit at furniture shows but may attend textiles shows that do not involve

furniture."  (Settlement Agreement ¶ 7).  LFI sets forth evidence that LCC participated in New York Now, a trade show involving furniture and other home furnishings, in February 2017. (Lindhe Tr. 123; Doc 87 – Ex. 18).  LCC disputes this evidence, pointing to deposition testimony from Mr. Lindhe who stated that LCC attended "textile market week" at New York Now and that this portion of the trade show did not involve furniture.  (Lindhe Tr. 123–25).  Accordingly, an issue of material fact remains as to whether LCC has breached this provision.

In addition, LCC's motion for summary judgment urges that LFI cannot prove damages as a matter of law.  But even if LFI cannot establish actual damages with reasonable certainty, an injured party can still recover nominal damages.  See KT Group Ltd. v. NCR Corp., 412 F. Supp. 3d 305, 326 (S.D.N.Y. 2019) (Gardephe, J.) (internal quotation marks and alterations omitted) ("Where actual damages have not been proven with the requisite certainty, and indeed even if the breach of contract caused no loss at all, nominal damages are available as a formal vindication of plaintiff's legal right to compensation.").

CONCLUSION

The Court denies LFI's motion for summary judgment.  The Court grants LCC's motion for summary judgment in part, finding no breach of the Settlement Agreement as to LCC's advertising and selling of products through third-party online retailer Perigold.com. LCC's motion for summary judgment is otherwise denied.  Lastly, the Court denies LCC's motion to strike as moot.  The Clerk is directed to terminate the motions.  (Docs 81, 93 & 108).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 23, 2021