**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEXINGTON FURNITURE INDUSTRIES, INC. d/b/a LEXINGTON HOME BRANDS., | |
| *Plaintiff*, | |
| v. | CIVIL ACTION NO. 1:19-cv-6239-PKC |
| THE LEXINGTON COMPANY, AB d/b/a THE LEXINGTON CLOTHING COMPANY, | |
| *Defendant*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT PURSUANT TO
RULE 59(e) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

# **TABLE OF CONTENTS**

I.    LEGAL STANDARD..................................................................................................... 1

II.   ARGUMENT ............................................................................................................... 2

  A.   LCC's Claim that the Jury's Verdict was Advisory Fails as a Matter of
       Law ................................................................................................................... 2

    i.   LCC Consented to a Jury Trial ............................................................... 2

    ii.  Lexington Was Entitled to a Jury Trial on Damages and
         Infringement............................................................................................ 3

  B.   The Court Need Not Provide Factual and Legal Findings................................ 5

  C.   LCC Fails to Show the Jury's Damages Awards Should be Altered.................... 6

    i.   LCC's Arguments Related to Disgorgement Should be Rejected ............ 6

      1.   LCC's Statement that Willfulness is a Prerequisite to
           Damages is Foreclosed by Binding Supreme Court
           Precedent................................................................................... 6

      2.   LCC's Alleged Lack of Profitability is Irrelevant ........................ 7

      3.   LCC's Arguments Regarding Costs are Waived and
           Foreclosed by the Law................................................................ 9

      4.   LCC's Arguments Regarding the Damages Period are
           Factually Incorrect ................................................................... 12

    ii.  LCC's Arguments Regarding Punitive Damages Are Meritless ............ 13

  D.   There Is Ample Record Evidence Of LCC's Infringement ................................ 15

    i.    Lexington's Marks Are Strong .............................................................. 17

    ii.   LCC's Infringing Marks Are Nearly Identical To Lexington's.............. 20

    iii.  The Parties' Products Are Not Only Proximate, They Overlap, And
          Lexington Has Already Bridged Any Alleged Gap................................ 22

    iv.   There Is Unrebutted Record Evidence Of Actual Confusion ................. 23

    v.    LCC Adopted The Infringing LEXINGTON Marks In Bad Faith ......... 23

    vi.   The Parties Offer Products of Comparable Quality and Target
          Similar Customers................................................................................. 24

III.  CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air China Ltd. v. Li.*,
  2010 WL 3260154 (S.D.N.Y. Aug. 5, 2010) .......................................................................14

*Better Angel Soc'y, Inc. v. Inst. for Am. Values, Inc.*,
  419 F. Supp. 3d 765 (S.D.N.Y. 2019) ...............................................................................18

*Broadnax v. City of New Haven*,
  415 F.3d 265 (2d Cir. 2005) ......................................................................................2, 3, 16

*Byrd v. Blue Ridge Coop.*,
  365 U.S. 525 (1958) ...........................................................................................................5

*Cache, Inc. v. M.Z. Berger & Co.*,
  No. 99 Civ. 12320(JGK), 2001 WL 38283 (S.D.N.Y. Jan. 16, 2001) ......................................4

*Car-Freshner Corp. v. D & J Distrib. and Mfg., Inc.*,
  No. 1:14-cv-391-PKC, Dkt. 114 ..........................................................................................4

*Car-Freshner, Corp. v. Am. Covers, LLC*,
  980 F.3d 314 (2d Cir. 2020) ...............................................................................18, 21, 22

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*,
  433 F.2d 686 (2d Cir. 1970) ...............................................................................................6

*Dairy Queen, Inc. v. Wood*,
  369 U.S. 469 (1962) ...........................................................................................................3

*Daisy Grp., Ltd. v. Newport News, Inc.*,
  999 F. Supp. 548 (S.D.N.Y. 1998) .......................................................................................4

*E.J. Brooks Co. v. Cambridge Security Seals*,
  31 N.Y.3d 441 (2018) ......................................................................................................15

*Ebker v. Tan Jay Int'l Ltd.*,
  741 F. Supp. 448 (S.D.N.Y. 1990) ...............................................................................14, 15

*Erchonia Corp. v. Bissoon*,
  410 F. App'x 416 (2d Cir. 2011) ......................................................................................18

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008) ..............................................................................................2, 7, 9, 15

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*,
    642 F. Supp. 2d 276 (S.D.N.Y. 2009) ...................................................................8, 10

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*,
    10 F. Supp. 3d 460 (S.D.N.Y. 2014) ............................................................................1

*Flat Rate Movers, Ltd. v. Flatrate Moving & Storage, Inc.*,
    104 F. Supp. 3d 371 (S.D.N.Y. 2015) .......................................................................21

*Forschner Grp., Inc. v. Arrow Trading Co. Inc.*,
    30 F.3d 348 (2d Cir. 1994) .......................................................................................18

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
    136 F. 3d 276 (2d Cir. 1998) ....................................................................................16

*George Basch Co., Inc. v. Blue Coral, Inc.*,
    968 F.2d 1532 (2d Cir. 1992) ............................................................................4, 6, 9

*Getty Petroleum Corp. v. Island Transp. Corp.*,
    878 F.2d 650 (2d Cir. 1989) .....................................................................................13

*Gucci Am., Inc. v. Accents*,
    994 F. Supp. 538 (S.D.N.Y. 1998) ..............................................................................4

*Hamil Am., Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999) .......................................................................................10

*Hollander v. Members of the Bd. Of Regents of the Univ. of the State of N.Y.*,
    524 F. App'x 727 (2d Cir. 2013) ................................................................1, 16, 17

*Hubbell v. Trans World Life Insur. Co. of N.Y.*,
    50 N.Y.2d 899 (1980) ...............................................................................................14

*Lee Pharm. v. Mishler*,
    526 F.2d 1115 (2d Cir. 1975) ......................................................................................5

*Lexington Mgmt. v. Lexington Cap. Partners*,
    10 F. Supp. 2d 271 (S.D.N.Y. 1998) .........................................................................20

*Life Indus. Corp. v. Star Brite Distrib., Inc.*,
    31 F.3d 42 (2d Cir. 1994) .........................................................................................25

*Lois Sportswear, U.S.A. v. Levi Strauss & Co.*,
    799 F.2d 867 (2d Cir. 1986) .....................................................................................18

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*,
    885 F.2d 1 (2d Cir. 1989) .....................................................................................8, 10

*Meridien Int'l Bank Ltd. v. Gov't of the Rep. of Liberia*,
  23 F. Supp. 2d 439 (S.D.N.Y. 1998)........................................................5

*Owens v. Gaffken & Barriger Fund LLC*,
  No. 08 Civ. 8414(WCC), 2009 WL 773517 (S.D.N.Y. Mar. 24, 2009)....................5

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
  86 F. Supp. 2d 305 (S.D.N.Y. 2000)......................................................25

*Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*,
  857 F.2d 80 (2d Cir. 1988).............................................................25

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012).............................................................1

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  140 S. Ct. 1492 (2020)..................................................................7

*Roy Export Co. v. CBS, Inc.*,
  672 F.2d 1095 (2d Cir. 1982)...........................................................13

*Savin Corp. v. Savin Grp.*,
  391 F.3d 439 (2d. Cir. 2004)...........................................................23

*Scarves by Vera, Inc. v. Todo Imports Ltd.*,
  544 F.2d 1167 (2d Cir. 1976)...........................................................20

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995)..............................................................2

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
  412 F.3d 373 (2d Cir. 2005)............................................................24

*In re The Newbridge Cutlery Co.*,
  776 F.3d 854 (Fed. Cir. 2015)..........................................................17

*Tiffany and Co. v. Costco Wholesale Corp.*,
  No. 13 CV 1041-LTS-DCF, 2019 WL 120765 (S.D.N.Y. Jan. 7, 2019) .................1, 15

*Virgin Enterprises Ltd. v. Nawab*,
  335 F.3d 141 (2d Cir. 2003)............................................................22

*Virgilio v. City of N.Y.*,
  407 F.3d 105 (2d Cir. 2005)............................................................14

*World Carpets, Inc. v. Dick Littrell's New World Carpets*,
  438 F.2d 482 (5th Cir. 1971) ..........................................................23

**Statutes**

15 U.S.C. § 1117(a) .................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 26(a) ..............................................................................................10

Fed. R. Civ. P. 26(e) .........................................................................................10, 11

Fed. R. Civ. P. 37(c) ..............................................................................................10

Fed. R. Civ. P. 39(c) .............................................................................................2, 3

Fed. R. Civ. P. 50(b) ..............................................................................................16

Fed. R. Civ. P. 52 ....................................................................................................5

Fed. R. Civ. P. 59(e) ...................................................................................... passim

Defendant The Lexington Company, AB's ("LCC") request that the Court alter the jury's verdict by striking the damages awarded to Plaintiff Lexington Furniture Industries, Inc. ("Lexington") and reversing the jury's likelihood of confusion finding should be denied. As set forth below, this case was properly tried to a jury. The jury carefully considered the evidence before it; unanimously found in favor of Lexington on all claims; and awarded damages the jury found appropriate in light of LCC's willful infringement. LCC's belated attempt to strike the jury's verdict has no merit. LCC's complaints regarding the damages awarded in this case are both legally and factually unsupported. And LCC's attempt to rehash its summary judgment arguments on likelihood of confusion through a Federal Rule of Civil Procedure ("Rule") 59(e) motion is not only procedurally improper, but it fails on the merits as well. For any or all of these reasons, LCC's motion (Dkt. 242) ("Motion") should be denied, and the jury's verdict should stand as rendered.

## I.    LEGAL STANDARD

It is well-settled that "jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). Thus, a Rule 59(e) motion to alter a judgment may be granted "only if the movant satisfies the heavy burden of demonstrating 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Hollander v. Members of the Bd. Of Regents of the Univ. of the State of N.Y.*, 524 F. App'x 727, 729 (2d Cir. 2013) (citations omitted). A motion to alter the judgment is an "extraordinary remed[y] to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 475 (S.D.N.Y. 2014) (citations and quotations omitted). Such a motion therefore "will be denied unless the moving party can point to controlling decisions or facts that the court overlooked that might reasonably be expected to alter the conclusion reached by the court." *Tiffany and Co. v. Costco Wholesale Corp.*, No. 13 CV 1041-LTS-DCF, 2019 WL 120765, at *2

(S.D.N.Y. Jan. 7, 2019) (citing *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). A motion under Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n. 5 (2008) (citations omitted).

## II.  ARGUMENT

### A.  LCC's Claim that the Jury's Verdict was Advisory Fails as a Matter of Law

LCC's entire motion is predicated on the incorrect statement that the jury's verdict in this case is not binding. To support that claim, LCC argues for the first time that, because Lexington sought LCC's profits as the remedy for its Lanham Act claims, the case is equitable and any jury verdict is merely advisory. *See* Motion at 2-5. This argument fails for at least two reasons.

### i.  LCC Consented to a Jury Trial

To start, the Court need not even address the question of whether Lexington's Lanham Act claims entitled it to a jury by right because LCC consented to a jury trial of those claims and therefore waived any argument that the verdict is advisory. Specifically, Rule 39(c) provides in pertinent part that, regardless of whether the case is triable of right by a jury, the Court "may, with the parties' consent, try any issue by jury." Fed. R. Civ. P. 39(c). In such a situation, the jury verdict "has the same effect as if a jury trial had been a matter of right." *Id.* Applying that Rule, the Second Circuit has made clear that, when "one party demands a jury, the other parties do not object, and the court orders trial to a jury, this will be regarded as jury trial by consent under Rule 39(c)." *Broadnax v. City of New Haven*, 415 F.3d 265, 271 (2d Cir. 2005). Here, Lexington properly demanded a jury on all claims from the outset. *See* Dkt. 1. At no point in the last four years did LCC object to that demand or move to strike it. To the contrary, LCC stipulated that the case would be tried to a jury in the Joint Proposed Pretrial Order. *See* Dkt. 182 at 4.  LCC submitted *voir dire* questions, jury questions, and a verdict form during the pretrial phase. *See* Dkt. 162, 163,

and 164. LCC also actively participated in the jury trial—including lengthy discussions regarding jury instructions—without ever once objecting that these issues were inappropriate for trial by jury, or even suggesting that any jury verdict should be advisory. LCC therefore, at a minimum, consented to a jury trial on all issues, foreclosing its post-verdict argument that the jury was merely advisory. *Broadnax* 415 F.3d at 272; *see also* Fed. R. Civ. P. 39(c)(2).

### ii.        Lexington Was Entitled to a Jury Trial on Damages and Infringement

Although the Court need not address whether seeking damages in the form of LCC's infringing profits impacted Lexington's jury trial right, were the Court nevertheless to do so, it should find Lexington was entitled to a jury on damages and infringement. LCC's position is refuted by the Supreme Court's *Dairy Queen* decision, which—like here—involved claims both for breach of contract and trademark infringement. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962). In finding that the plaintiff had a Seventh Amendment jury trial right in *Dairy Queen*, the Supreme Court recognized that, even if the plaintiff were seeking "to recover whatever was owed them under the contract as of the date of its purported termination plus damages for infringement of their trademark since that date," the plaintiff's "claim for a money judgment is a claim wholly legal in its nature" and should be tried to a jury. *Id.* at 476-77. This result, the Court held, stands "whether the theory finally settled upon is that of breach of contract, that of trademark infringement, or any combination of the two." *Id.* at 479. Here, Lexington's Lanham Act claims were predicated on LCC's infringing use of multiple trademarks, including the Lexington Flag Logo addressed in the settlement agreement. Like in *Dairy Queen*, Lexington's requests for nominal damages based on LCC's breach as well as LCC's profits based on its infringement are legal in nature and entitled Lexington to a jury determination of those issues. LCC's claims to the contrary should be rejected.

Lexington's right to a jury trial is further bolstered by numerous cases addressing Lanham Act disgorgement claims even where there was no attendant breach of contract claim. The Second Circuit recognizes at least three theories under which a trademark plaintiff may disgorge the defendant's infringing profits: (a) as a proxy for the plaintiff's lost sales and reputational harm (which are generally difficult to prove with certainty); (b) to deter future infringement; and (c) to prevent the defendant from being unjustly enriched. *See George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537-39 (2d Cir. 1992). Where disgorgement is sought based on one of the first two theories of recovery, courts within this circuit have held that disgorgement is legal in nature and entitles the plaintiff to a jury trial. *See, e.g.*, *Cache, Inc. v. M.Z. Berger & Co.*, No. 99 Civ. 12320(JGK), 2001 WL 38283, at *16 (S.D.N.Y. Jan. 16, 2001) (denying a motion to strike the jury demand and collecting cases where courts have found a jury trial right despite the plaintiff seeking an accounting of profits); *Daisy Grp., Ltd. v. Newport News, Inc.*, 999 F. Supp. 548, 552 (S.D.N.Y. 1998) (finding a right to a jury trial because "a claim for an infringer's profits as a proxy for damages 'is more analogous to a suit for damages' than to an equitable action"); *Gucci Am., Inc. v. Accents*, 994 F. Supp. 538, 540-41 (S.D.N.Y. 1998) (finding a jury trial right where disgorgement was sought based on theory of deterrence); *Car-Freshner Corp. v. D & J Distrib. and Mfg., Inc.*, No. 1:14-cv-391-PKC, Dkt. 114 at 2-3 (submitting the damages question of profits to the jury).

LCC seeks to avoid those cases by improperly suggesting that Lexington sought disgorgement exclusively under a theory of unjust enrichment. *See* Motion at 3-4 (relying exclusively on cases related to unjust enrichment). That is not true. Lexington sought disgorgement under all three theories of recovery recognized in the Second Circuit, including as a proxy for Lexington's actual damages because the parties sell overlapping products (*e.g.*, pillows and

bedding) and to deter LCC's willful infringement. LCC's argument regarding Lexington's jury trial right fails for this independent reason too.

Finally, even if the Court were to conclude that Lexington did not have a right to a jury finding on disgorgement, Lexington was still entitled to a jury finding on infringement. The Second Circuit has previously found a right to a jury trial on infringement, regardless of the remedy sought. *See Lee Pharm. v. Mishler*, 526 F.2d 1115, 1117 (2d Cir. 1975) (citing *Byrd v. Blue Ridge Coop.*, 365 U.S. 525, 538 (1958)). Lexington also pleaded and tried a separate state law claim for unfair competition that, as the Court found, was coextensive with its Lanham Act infringement claim. That state law unfair competition claim entitled Lexington to punitive damages, which are widely recognized as a legal remedy. *See, e.g.*, *Owens v. Gaffken & Barriger Fund LLC*, No. 08 Civ. 8414(WCC), 2009 WL 773517, at \*2 (S.D.N.Y. Mar. 24, 2009) (plaintiff's claims seeking compensatory and punitive damages were legal in nature); *Meridien Int'l Bank Ltd. v. Gov't of the Rep. of Liberia*, 23 F. Supp. 2d 439, 453 (S.D.N.Y. 1998) at n.10 (the "claims for compensatory damages and punitive damages are legal in nature"). Accordingly, Lexington had a right to a jury trial on both its Lanham Act infringement and unfair competition claims, meaning that the jury's finding of likelihood of confusion cannot be considered advisory, regardless of how the Court resolves the Lanham Act disgorgement issue.

### B.     The Court Need Not Provide Factual and Legal Findings

Based on its incorrect position that the jury's verdict was merely advisory, LCC argues that the "Court must make its own factual findings and conclusions" and "explain how it arrived at those findings and conclusions." Motion at 4-5 (citations and quotes omitted). That is not correct.

Rule 52 requires a court to make its own factual findings and conclusions of law only in two limited circumstances: (1) where an action is tried on the facts without a jury; or (2) where the jury is empaneled to provide an advisory verdict. Fed. R. Civ. P. 52. Neither circumstance is

present in this case. As such, there is no requirement that the Court provide its own factual findings and conclusions of law.

### C.   LCC Fails to Show the Jury's Damages Awards Should be Altered

The main thrust of LCC's motion is its request that the Court alter the jury's profits and punitive damages awards so that Lexington is left with no monetary recovery in this case. *See* Motion at 6-12. Each of LCC's arguments fail, so its request to strike the damages awarded to Lexington should be denied, leaving the jury's verdict undisturbed. It is also worth noting, because LCC must invoke principles of equity to request the Court alter any damages award, that LCC never provided Lexington with financial information for the period of November 2021 through the present, even though LCC continues to infringe Lexington's trademarks. *See* Dkt. 235 at 3-5. Lexington's damages award is therefore already significantly discounted by LCC's failure to provide this information, and LCC should not be permitted to discount it further.

### i.   LCC's Arguments Related to Disgorgement Should be Rejected

At the conclusion of trial, the jury awarded to Lexington $1,641,963 in the form of LCC's infringing profits. LCC now attempts to alter that award based on four separate arguments: (1) the legally inaccurate claim that willfulness is a prerequisite to disgorgement; (2) LCC's alleged lack of profitability; (3) improper attempts to get the Court to deduct LCC's undifferentiated costs; and (4) factually incorrect arguments regarding the damages period. For the reasons that follow, each of LCC's arguments fail, and the jury's profits award should stand.

### 1.   LCC's Statement that Willfulness is a Prerequisite to Damages is Foreclosed by Binding Supreme Court Precedent

Relying upon the Second Circuit's *Carl Zeiss*[1] and *Basch* opinions, LCC argues that Lexington is not entitled to damages in the form of LCC's infringing profits where "there has been

---

[1] *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686 (2d Cir. 1970).

no showing of fraud or palming off" and that Lexington was required to "prove that [LCC] acted with willful deception." *See* Motion at 2-3. This argument is meritless.

As LCC is undoubtedly aware, the Supreme Court expressly abrogated the Second Circuit's prior precedent that made willfulness a prerequisite to a disgorgement award in 2020, holding that "[a] plaintiff in a trademark infringement suit is not required to show that a defendant willfully infringed the plaintiff's trademark as a precondition to a profits award." *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1493 (2020). LCC's suggestion that the Court ignore this binding Supreme Court precedent should be rejected.

Moreover, to the extent LCC intended this argument to claim that Lexington is not entitled to disgorgement based on a theory of unjust enrichment, it still fails. As noted above, Lexington's profits recovery is based on all three theories of recovery recognized by the Second Circuit: (a) as a proxy for Lexington's actual damages; (b) in order to deter LCC's future infringement; and (c) to prevent unjust enrichment. The first category does not require a showing of willfulness. And although the second two can be demonstrated through a showing of willfulness, that showing has been made in this case. As reflected by the verdict form, the jury found LCC to be a willful infringer. *See* Dkt. 212 at 1. Disgorgement is therefore available and proper here even under an unjust enrichment theory of recovery.

## 2.    LCC's Alleged Lack of Profitability is Irrelevant

LCC next argues that "disgorgement is improper" because it "did not earn any profit during the time period in question." *See* Motion at 5-6. This argument likewise fails for several reasons.

To start, the argument itself is plainly improper for a motion under Rule 59(e). As the Supreme Court has made clear, a Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping*, 554 U.S. at 485 n. 5 (citations omitted). At trial, Lexington presented evidence of

LCC's revenue from infringing sales, as required under 15 U.S.C. § 1117(a). It was then LCC's burden to demonstrate its applicable costs and to show a clear nexus between those costs and the infringing revenues. *See, e.g.*, *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 8 (2d Cir. 1989); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276, 281 (S.D.N.Y. 2009). As discussed more fully below and in prior briefing, LCC failed to do so. *See infra* § II.C.i.3; *see also* Cornelia Declaration, ¶ 17 (citing Lexington's June 1, 2022 letter brief). LCC cannot now try to bring that issue through the backdoor by relitigating it through a Rule 59(e) motion.

Yet even assuming *arguendo* LCC could relitigate this issue, its lack of profitability does not warrant altering the jury's damages award. First, LCC's claims regarding its alleged lack of profitability are based on LCC's business as a whole. In other words, it does not separate out LCC's infringing business from its non-infringing business and therefore deprives the Court of the ability to determine whether LCC's infringing business was profitable. For the same reasons that courts will not permit defendants to deduct non-differentiated costs from infringing revenue, the Court should reject LCC's attempt to avoid disgorgement because its United States business as a whole operated at a loss. Furthermore, Mr. Lindhe testified that LCC's U.S. business represented only 0.2% of LCC's overall business and did not indicate that the overall business was unprofitable. *See* Dkt. 215, May 26 Tr. Trans. at 132:21-133:6. In this context, it is certainly not inequitable that LCC was required to disgorge this very small portion of its overall revenues.

Second, regardless of whether LCC's business was profitable, full disgorgement is warranted under the circumstances of this case. The jury found LCC to be a willful infringer. Dkt. 212 at 1. It also found punitive damages were warranted based on LCC's total disregard and indifference for Lexington's intellectual property rights. *Id*. Lexington put on significant evidence

of actual confusion through every single witness that testified, including testimony by Robert Stamper that key interior designers had decided not to do business with Lexington after mistakenly believing LCC's stores were Lexington's store. *See* Dkt. 217, May 27 Tr. Trans. at 366:9-367:23. Simply because LCC claims its infringing activities were ultimately not profitable does not excuse its conduct or warrant a conclusion that it should not be held accountable for its decisions. In fact, LCC's argument that it continued to engage in willful infringement while allegedly losing millions of dollars only underscores that full disgorgement is necessary. Such a willingness to continue knowingly infringing Lexington's rights even though LCC was allegedly losing millions of dollars shows indifference to the rights of others and confirms that disgorgement is necessary to deter future infringement. *See Basch*, 968 F.2d at 1539 (permitting an award of "the profits of a bad faith infringer" to "promote the secondary effect of deterring public fraud"). LCC provides no argument to support a contrary conclusion, and its motion should be denied.

### 3.    LCC's Arguments Regarding Costs are Waived and Foreclosed by the Law

LCC next argues that the Court should alter the disgorgement award in order to deduct LCC's claimed costs. The parties, however, litigated this issue thoroughly during trial, and at LCC's insistence, the Court submitted those costs to the jury under LCC's theory that they could be deducted if the jury found they were wholly attributable to the sale of infringing products. *See* Dkt. 219, May 31 Tr. Trans. at 552:23-553:19; Dkt. 221, June 1 Tr. Trans. at 625:14-626:10. LCC cannot now be heard to complain that the jury rejected LCC's own theory of deductible costs. Nor should LCC be allowed to offer a new formula for deductible costs that it did not proffer at trial. As noted above, a motion under Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon*

*Shipping*, 554 U.S. at 485 n. 5 (citations omitted). LCC's untimely and procedurally improper request for a second bite at the apple should be rejected.

Should the Court nevertheless entertain LCC's new claim that its costs should be deducted based on a pro rata percentage of LCC's infringing to non-infringing sales, that argument should still be rejected for three independent reasons. ***First***, LCC's new proposed formula is plainly at odds with the law. As LCC itself acknowledges, an infringer may only deduct costs if "'each category is ***directly*** and ***validly connected*** to the sale and production of the infringing product' by a '***strong nexus***.'" Motion at 7 (citing *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 107 (2d Cir. 1999)) (emphasis added); *see also Manhattan Indus.*, 885 F.2d at 8; *Fendi Adele*, 642 F. Supp. 2d at 281. It is therefore no surprise that LCC fails to cite even a single case in which a formula like the one it advances was adopted.

***Second***, LCC not only failed to present this formula during trial, but also failed to disclose it during discovery. Rule 37(c) is clear that, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c). Here, Lexington's first set of interrogatories served nearly three years ago included an interrogatory directed at this very issue:

> INTERROGATORY NO. 3: Identify LCC's calculation of profits from sales of goods in connection with the term "Lexington" dating back to January 1, 2012 in the United States, including total revenues, the number of units sold, any expenses deducted to calculate profits, and any documents relied upon to calculate revenues and profits, and the identity of any individual(s) who calculated these profits.

*See* Cornelia Declaration, ¶¶ 5-6. In response, LCC did not offer any theory or explanation of its allegedly deductible costs. LCC simply referred Lexington to three documents containing LCC financial data. *See id.*, ¶¶ 7-15. LCC was under an ongoing obligation pursuant to Rule 26(e) to

supplement this response if its theory regarding deductible costs changed. Fed. R. Civ. P. 26(e).
While LCC did supplement its interrogatory answers, it never disclosed the theory it now
advances. LCC also has not—and cannot—show that its failure to do so is substantially justified
or harmless. This too requires that LCC's untimely new formula be rejected.

      ***Third*** and finally, LCC's application of its "formula" must be rejected because it is not
supported by the record. To start, LCC's claim that it "had $1,243,124 of [] infringing product
revenue" and "$1,511,867 of non-infringing product revenue" is factually incorrect. Motion at 8.
Specifically, LCC does not include any of its "webshop" and "other" sales in its revenue numbers.
Admitted trial exhibits show these omitted sources of LCC's revenue account for an additional
$725,000—including ***all of LCC's reported revenue for 2020 and 2021***.[2] *See* Dkt. 215, May 26
Tr. Trans. at 127:4-128:17 (citing PX-CK, which shows, for example, that LCC's "webshop" sales
from 2013 to 2018 included $216,461 in non-clothing revenue). By omitting over $700,000 (i.e.,
25%) of its revenue,[3] LCC overstates the percentage of its revenue attributable to its infringing
sales by approximately 10%. Thus, even if LCC's formula could be adopted (which it cannot), the
percentage of revenue attributable to "home" would be 35%, not 45% as claimed by LCC.

      LCC therefore has not—and cannot—provide any support for its requested percentage
reduction, and it should be disregarded. Even more important, and fatal to LCC's argument, is the
complete lack of record evidence to support its proposed allocation of costs. For such a formula to
be proper, LCC would need to point to evidence that, among other things, its marketing, retail
space, personnel, and other overhead expenses were expended on non-infringing and infringing

---

[2] This is particularly problematic because LCC's closed its last brick-and-mortar store in the U.S.
in 2019, meaning that LCC's calculation fails to account for ***any*** revenues from 2020 onward.
[3] Calculated as the unreported income divided by LCC's alleged total revenue, or $725,000 divided
by $2,754,991, resulting in a 26.4% underreporting.

products in the exact same proportion to the corresponding sales revenues derived from those products. That is, LCC would need to show that just as it derived 35% of its revenue from home goods, 35% of its advertising, for example, was also specific to home goods. The record is completely devoid of evidence that could support such an allocation.

### 4.    LCC's Arguments Regarding the Damages Period are Factually Incorrect

In a final attempt to alter the jury's damages award, LCC claims that "any damages award should necessarily exclude LCC's profits prior to 2017" because "the record is [allegedly] devoid of evidence of infringing trademark use by LCC before 2017." Motion at 9. LCC is again incorrect.

The jury issued a verdict that LCC's use of LEXINGTON, LEXINGTON COMPANY, and the LEXINGTON Flag Logo infringe Lexington's senior LEXINGTON trademarks. The record contains sufficient evidence to show LCC's use of those infringing marks since at least as early as 2012. For example, Mr. Lindhe—LCC's sole witness and chief operating officer— testified at trial that LCC opened its first U.S. store in April of 2012, followed by two additional U.S. stores in 2013 and 2014. *See* Dkt. 215, May 26 Tr. at 138:21-139:19. Mr. Lindhe further testified that, although LCC sold its home textiles through these U.S. stores, LCC used the infringing marks LEXINGTON or LEXINGTON COMPANY as the primary identifier of its products within those stores. *See id.* at 95:20-23, 138:4-20, 142:7-23. He also admitted that, once a consumer left the store, all branding on LCC's products—including shopping bags—consisted of the infringing marks LEXINGTON or LEXINGTON COMPANY. Dkt. 217, May 27 Tr. at 236:3-1, 237:2-8.

Similarly, admitted exhibits demonstrate that LCC's infringement began long before 2017. For example, PX-BO contains screenshots of infringing posts LCC made on its Facebook page in multiple years, including but not limited to two posts from 2012. *See* Dkt. 217, May 27 Tr. Trans.

at 239:14-242:8; *see also* PX-BO at 4-5. The same exhibit also contains photos from 2012, 2014, and other years showing LCC's use of the infringing marks at U.S.-based events. *See* PX-BO at 3-4. These posts not only demonstrate instances of infringement well before 2017, but they also confirm that LCC's social media accounts have existed since at least 2012. Mr. Linde testified that LCC's social media pages have always used the LEXINGTON and LEXINGTON COMPANY trademarks that the jury found were infringing, and that those pages have been, at all times, accessible in the United States. *See* Dkt. 215, May 26 Tr. Trans. at 85:7-86:6, 89:13-21. Accordingly, the record contains sufficient evidence that LCC's infringement has been ongoing since it began selling in the United States in 2012. LCC's argument that damages should be limited to revenues from 2017 to the present therefore fails.

## ii. LCC's Arguments Regarding Punitive Damages Are Meritless

LCC's claim that punitive damages are unavailable is legally incorrect and should be rejected. LCC previously admitted before this Court that punitive damages are available under the claims in this case. *See* Cornelia Decl., ¶ 16 (citing August 31, 2021 Final Pretrial Conference Transcript at 40:16-41:7). Punitive damages are available under New York law where a "defendant's conduct has constituted 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree." *Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 657 (2d Cir. 1989) (citations omitted). In the context of a claim for unfair competition, "New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness,…whether or not directed against the public generally…" *Id.* (citing *Roy Export Co. v. CBS, Inc.*, 672 F.2d 1095, 1106 (2d Cir.), *cert. denied*, 459 U.S. 826 (1982). Thus, there is no dispute that Lexington's common law unfair competition claim provides for punitive damages. It is also undisputed that, applying this standard, the jury unanimously found LCC liable for common law unfair competition and further found that LCC's conduct was so egregious that it warranted

punitive damages. *See* Dkt. 212 at 1. LCC does not—and cannot—attack those findings. The jury's punitive damages award is therefore proper and should stand.[4]

LCC nevertheless tries to avoid that result by claiming that, because Lexington "only sought disgorgement of its profits [sic]," Lexington purportedly "is not legally entitled to punitive damages." *See* Motion at 12. That is incorrect.

LCC's cited cases recognize that New York law requires punitive damages to be linked to a claim that provides for compensatory recovery and evidence that the plaintiff suffered an injury from the defendant's misconduct. Motion at 10-12.[5] While those elements may have been lacking in LCC's cited cases, they are not here: as noted above, Lexington's unfair competition claim provides the underlying claim entitling it to punitive damages and the jury's award of damages to Lexington confirms they found a compensable injury. There was ample evidence of injury to Lexington on the record. *See* Dkt. 217, May 27 Tr. Trans. at 320:16-321:21; *id.* at 364:16-367:23. Every single one of LCC's cases are therefore inapposite.

Importantly, LCC does not—and cannot—cite a single case holding that Lexington cannot recover punitive damages because it chose to recover damages in the form of disgorgement. This is not surprising. At least one court in this district has previously rejected that exact same argument, concluding that disgorgement remains reflective of a compensatory award due to the Lanham Act's

---

[4] The Court need not address LCC's arguments that punitive damages are not available under the Lanham Act. *See* Motion at 10. Lexington has never suggested they are, and both the jury instructions and verdict form are clear that punitive damages may be predicated only on Lexington's claim for common law unfair competition. *See, e.g.*, Dkt. 212 at 2.

[5] *See Virgilio v. City of N.Y.*, 407 F.3d 105, 117-18 (2d Cir. 2005) (punitive damages not available because underlying claim was unviable); *Air China Ltd. v. Li.*, 2010 WL 3260154 (S.D.N.Y. Aug. 5, 2010) (punitive damages unavailable because no damages awarded on fraudulent inducement claim); *Ebker v. Tan Jay Int'l Ltd.*, 741 F. Supp. 448, 472 (S.D.N.Y. 1990) (no punitive damages because the plaintiff failed to show she was damaged by the defendant's actions); *Hubbell v. Trans World Life Insur. Co. of N.Y.*, 50 N.Y.2d 899, 901 (1980) (punitive damages not available because no viable underlying claim).

structure. *See, e.g.*, *Tiffany and Co. v. Costco Wholesale Corp.*, No. 13 CV 1041-LTS-DCF, 2019 WL 120765, at *6 (S.D.N.Y. Jan. 7, 2019) (permitting recovery of punitive damages where plaintiff sought an accounting of profits and rejecting the claim that plaintiff could not recover punitive damages without electing compensatory or actual damages). Similarly, LCC's own cases disprove its argument. For example, in *Ebker v. Tan Jay Int'l Ltd.*, the court recognized "[it] is not the ***form*** of the action that gives the right to the jury to give punitive damages, but the moral culpability of a defendant." 741 F. Supp. 448, 472 (S.D.N.Y. 1990). Similarly, LCC's only cited case that actually involves a New York unfair competition claim—*E.J. Brooks Co. v. Cambridge Security Seals*—recognizes that disgorgement is a form of damages:[6]

> To be sure, courts may award a defendant's unjust gains as a proxy for compensatory damages in an unfair competition case. However, the accounting for profits under such circumstances is not in lieu of . . . damages, but is a *method of computing damages*.

31 N.Y.3d 441, 450 (N.Y. 2018) (emphasis in original) (citations and internal quotes omitted). Accordingly, LCC provides no legal support for its argument that punitive damages must be stricken, and its request should be denied.

### D. There Is Ample Record Evidence Of LCC's Infringement

As an initial matter, LCC's Rule 59(e) Motion is an entirely inappropriate vehicle to relitigate the question of likelihood of confusion. *Exxon Shipping*, 554 U.S. at 485 (holding that a motion under Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."). This alone is reason to reject LCC's argument that the trial record is insufficient to support a finding of likelihood of confusion.

---

[6] Although *E.J. Brooks* is LCC's only case that involves New York unfair competition claims, it actually does not address the question of when punitive damages are available, but instead discusses whether a trade secret plaintiff can measure damages by avoided costs. *E.J. Brooks Co. v. Cambridge Security Seals*, 31 N.Y.3d 441 (2018).

Indeed, before the Court is required to consider the merits of LCC's argument, LCC was required to satisfy the "heavy burden [of] demonstrating 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Hollander*, 524 F. App'x at 729 (citations omitted). LCC does not contend, nor can it, that there has been an intervening change of controlling law or that new evidence of non-infringement has surfaced since the jury's verdict.[7] Nor is there any legitimate argument that the jury's infringement verdict was "a clear error" or causes "manifest injustice." Because LCC fails to satisfy the threshold requirement of a Rule 59(e) motion, the Court can and should reject LCC's argument without addressing the merits.[8]

LCC's attack of the jury's likelihood of confusion determination is more appropriately considered a thinly veiled Rule 50(b) motion for judgment as a matter of law. A "judgement as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F. 3d 276, 289 (2d Cir. 1998). LCC's Motion falls far short of satisfying this high burden.

Notably, LCC's arguments on likelihood of confusion are strikingly similar to those made by LCC in its summary judgment motion; arguments the Court denied over a year ago. *Compare*

---

[7] To the contrary, as set forth in detail in Lexington's Motion for Permanent Injunction (Dkt. 235), LCC continued its infringing conduct for weeks following the jury's verdict. Worse yet, even as of July 10, 2022, LCC continues to infringe by, *inter alia*, offering to sell pillows and other home goods bearing infringing LEXINGTON marks.

[8] This is to say nothing of the fact that LCC also failed to object to Lexington's request for a jury trial. As a result, LCC consented to a jury trial on infringement and may not now—after an adverse judgment—raise an objection. *See Broadnax*, 415 F.3d at 271.

Dkt. 242 at 12-25 *with* Dkt. 94 at 9-24; *see also* Dkt. 115 at 19-20 (denying LCC request for summary judgment on likelihood of confusion). Worse, LCC's arguments rely heavily upon evidence that was not introduced at trial, while only sparingly referencing the record. This rehashing of previously rejected arguments, without meaningful citation to the trial record, is alone sufficient to deny LCC's Motion.

Yet even on the merits, LCC's Motion fails. As set forth below, there is ample record evidence supporting the jury's finding of a likelihood of confusion under the *Polaroid* factors. This is particularly true here because LCC asks the Court to reverse the jury's verdict on a Rule 59(e) motion. To satisfy its high burden, LCC must demonstrate that the jury's verdict was "clear error" or rises to the level of "manifest injustice." *Hollander*, 524 F. App'x at 729. LCC fails to do so.

### i.     Lexington's Marks Are Strong

LCC argues that Lexington's marks are weak for four reasons: (1) they are allegedly geographically descriptive; (2) they allegedly have not acquired distinctiveness; (3) they allegedly are not the primary identifiers of Plaintiff Lexington's products; and (4) there are alleged third-party registrations that use a LEXINGTON mark. *See* Motion at 13.

The LEXINGTON marks are not geographically descriptive. The only record evidence cited by LCC on this point is that Lexington was founded in Lexington, North Carolina.[9] This is plainly insufficient to carry LCC's burden. Indeed, a mark is only considered geographically descriptive (and therefore weak) if the place identified is generally known to the public, and if the public would make the place/goods association, i.e. believe that the goods originate in that place. *In re The Newbridge Cutlery Co.*, 776 F.3d 854 (Fed. Cir. 2015). LCC does not even claim, let alone point to evidence, that such an association exists.

---

[9] LCC's argument regarding an alleged concession of acquired distinctiveness on a LEXINGTON trademark registration is unsupported by the trial record and should not be considered.

In fact, when considered as a whole, the record supports a finding that LEXINGTON is used arbitrarily, not descriptively. *See Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 30 F.3d 348, 354 (2d Cir. 1994) ("Conversely, a geographic term may enjoy trademark protection without a showing of secondary meaning when it is used in an arbitrary or suggestive manner, taking into account the nature of the goods or services at issue."). Lexington is headquartered in Thomasville, North Carolina and manufactures its products in Hickory, North Carlina. *See* Dkt. 217, May 27 Tr. Trans. at 332:25-333:12. There is also evidence that Lexington, North Carolina is not famous for furniture. *See* Dkt. 219, May 31 Tr. Trans. at 465:21-25. This supports a finding that Lexington, North Carolina is not likely to be generally known to the public and that consumers are not likely to make the place/goods association with Lexington. Indeed, LCC itself claims to have adopted the Lexington name to evoke New England, not Lexington, North Carolina. *See* Dkt. 215, May 26 Tr. Trans. at 115:3-116:9.

The LEXINGTON marks are distinctive. LCC's argument regarding secondary meaning is a strawman. The issue of secondary meaning, and the six factors noted by LCC, address whether a plaintiff has rights in an ***unregistered*** mark. *See Erchonia Corp. v. Bissoon*, 410 F. App'x 416 (2d Cir. 2011). By contrast, "registered trademarks are presumed to be distinctive and should be afforded the utmost protection." *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986). Where, as here, the registration is incontestable, the mark is entitled to a "conclusive presumption of distinctiveness." *Better Angel Soc'y, Inc. v. Inst. for Am. Values, Inc.*, 419 F. Supp. 3d 765, 775 (S.D.N.Y. 2019) (internal quotes omitted).

Even if secondary meaning were relevant, LCC's arguments fail. Factors relevant to secondary meaning include advertising expenditures, unsolicited media coverage, sales success, and the length of use of a mark. *See Car-Freshner, Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329

(2d Cir. 2020). LCC admits Lexington introduced evidence of substantial investments in advertising the LEXINGTON brand, of mainstream media coverage, and of significant sales, and the record reflects Lexington's use of the LEXINGTON mark for nearly 100 years. *See* Motion at 15-17; *see also* Dkt. 217, May 27 Tr. Trans. at 329:25-330:3; Dkt. 219, May 31 Tr. Trans. at 421:12-431:6. These facts all support a finding that the LEXINGTON marks have developed secondary meaning. LCC cites no contrary evidence; it merely questions the sufficiency of the evidence of distinctiveness. This is plainly insufficient to satisfy LCC's high burden on a Rule 59(e) motion.

<u>The LEXINGTON marks are the primary identifier of Lexington's goods.</u> The crux of LCC's argument to the contrary is that Lexington allegedly "failed to establish at trial that consumers associate [Lexington] with the source of its products." *See* Motion at 17. The record developed at trial reflects precisely the opposite. For example, Mr. Stamper testified that consumers are well aware that Lexington is the source of its products, even where they are sold under one of Lexington's collections. Dkt. 219, May 31 Tr. Trans. at 470:18-25 ("Most consumers are very well aware that Lexington makes Tommy Bahama product."); *id.* at 476:9-20 (when customers refer to Lexington's Oyster Bay line, its "usually Oyster Bay by Lexington, because they know we carry multiple brands."). Moreover, the packaging for Lexington's furniture "will always say Lexington Home Brands." *Id.* at 412:10-20. There was also record evidence and testimony that LEXINGTON is used as the primary source identifier on signage, price tags, permanent tags, on point of sale materials, and in advertising. *See, e.g.*, Dkt. 217, May 27 Tr. Trans. at 253:25-254:22; *id.* at 283:12-16 (discussing PX-M); *id.* at 318:1-16; *id.* at 318:25-319:13 (discussing PX-L); *id.* at 338:3-339:13 (discussing PX-Y); *id.* at 339:23-340:17 (discussing PX-CC); Dkt. 219, May 31 Tr. Trans. at 406:18-408:20 (discussing PX-LP); *id.* at 408:22-409:10 and

410:11-411:1 (discussing PX-PF); *id.* at 411:2-412:20 (discussing PX-W); *id.* at 431:21-432:24 (discussing PX-NO); *id.* at 458:17-459:1. In view of the record and LCC's failure to cite any evidentiary support, LCC's claim that Lexington's marks "are weak because consumers are likely to recognize the source of such products as the collection names and licensed brands" is without merit.

        <u>Third-party LEXINGTON trademarks in the record, if any, are not relevant.</u> Despite the lack of evidence, LCC claims that Lexington's marks "are weak because they are diluted by numerous LEXINGTON-formative marks ***on the Principal Register*** owned by numerous third party owners." Motion at 18 (emphasis added). There is simply no evidence in the record demonstrating federally-registered LEXINGTON trademarks owned by third parties, let alone that any such alleged marks are actually used in commerce on comparable products.[10] *See Lexington Mgmt. v. Lexington Cap. Partners*, 10 F. Supp. 2d 271, 281 (S.D.N.Y. 1998) (for evidence to be competent, the "alleged infringer must demonstrate that the third-party marks were 'actually used by third-parties, that they [are] well promoted or that they[are] recognized by consumers") (citing *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976)).

### ii.  LCC's Infringing Marks Are Nearly Identical To Lexington's

        LCC's argument is a nearly word-for-word reproduction of its previously-rejected summary judgment argument.[11] As before, LCC's claim that the parties' marks are not similar is unsupported by the record and inconsistent with the law. Despite arguing that the parties' marks

---

[10] To be sure, the testimony relied upon by LCC does not support LCC's claim. Rather, that testimony merely acknowledges that unidentified third parties use Lexington in the United States in connection with unidentified goods or services.

[11] Highlighting LCC's studious recreation of its summary judgment argument is its claim that "LCC's advertising materials and packaging prominently display…the words CLOTHING CO. as necessary." *See* Motion at 19. This statement is not only unsupported by the record but is directly contradicted by the jury's breach of contract verdict—which LCC has not challenged.

differ in terms of visual impact and connotation, LCC is unable to point to any record evidence demonstrating either.

The visual similarity inquiry "begins with the words of the marks." *See* Dkt. 115 at 16 (citing *Car-Freshner*, 980 F.3d at 330). There can be no legitimate dispute that the dominant word in Lexington's trademarks and LCC's infringing marks is LEXINGTON, which favors a finding of confusion. *See Flat Rate Movers, Ltd. v. Flatrate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 380 (S.D.N.Y. 2015). Unable to argue LEXINGTON is not the dominant word in the parties' marks, LCC instead focuses on its flag logo as compared to Lexington's stylized LEXINGTON marks. But the flag logo was not the only way that LCC uses the LEXINGTON mark in commerce, and there was ample evidence that LCC used the trademark LEXINGTON outside of the flag logo in a font that was nearly identical to the font in Lexington's registered trademark. *See, e.g.*, PX-AF, PX-DG, PX-FI, PX-FK, PX-GQ, PX-KS, PX-JN, PX-PI, PX-PM. Plus, as the Court has already correctly noted, "[t]he term 'Lexington' is [] contained within LCC's Flag Logo." *See* Dkt. 115 at 16.

LCC's argument as to connotation likewise lacks any support in the record. There is simply no evidence that the "LCC Marks overtly convey imagery of the American Revolutionary war and historical New England traditions," as LCC claims. *See* Motion at 20. Tellingly, LCC criticizes the asserted connotation of Lexington's marks because of an "absence of a survey or consumer testimony," yet LCC fails to cite either in support of its own claim. *See id.* LCC instead relies upon the description of LCC—as a company and not as it relates to the connotation of its flag logo— from LCC's own website. *See id.* This is plainly insufficient to satisfy LCC's heavy burden.

### iii.     The Parties' Products Are Not Only Proximate, They Overlap, And Lexington Has Already Bridged Any Alleged Gap

The parties directly compete at least in the market for pillows and bedding in connection with their respective LEXINGTON marks. *See* Dkt. 215, May 26 Tr. Trans. at 58:6-17; Dkt. 217, May 27 Tr. Trans. at 196:7-14; *id.* at 230:14-231:6; *id.* at 279:9-24; *id.* at 317:20-25; *id.* at 330:4-8. Unable to challenge this fact, LCC instead relies on testimony that Lexington does not view LCC as one of its ***primary*** competitors, despite testimony that they compete in home textiles. *See* Dkt. 219, May 31 Tr. Trans. at 406:3-5. Yet "[e]ven if the parties are not considered competitors, a reasonable jury could find that the proximity factor weighs in [Lexington's] favor due to the complementary nature of [Lexington's] furniture products and LCC's home products." Dkt. 115 at 18 (citing *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003)). Indeed, LCC itself admits that Lexington's pillows and bedding are sold "to complement its furniture." *See* Motion at 22. Moreover, the record reflects multiple examples of brands in the United States that sell both home textiles and furniture, further demonstrating the proximity of the parties' respective products. *See* Dkt. 215, May 26 Tr. Trans. at 61:21-62:12; Dkt. 217, May 27 Tr. Trans. at 253:3-14. Even LCC's own list of competitors includes three companies that sell both furniture and home textiles. *See* Dkt. 215, May 26 Tr. Trans. at 61:8-63:18 (discussing DX-61); Dkt. 219, May 31 Tr. Trans. at 406:6-12. While LCC fails to address the "bridging the gap" factor, the Court has already found that it "is likely 'irrelevant' because [Lexington] is already using its marks, at least to some extent, in the same subject matter area and geographic area as LCC." Dkt. 115 at 19 (citing *Car-Freshner*, 980 F.3d at 332). The evidence at trial as to Lexington's continued expansion into home textiles also demonstrated Lexington is likely to continue to bridge any gap. *See* Dkt. 219, May 31 Tr. Trans. at 406:3-5. As such, this factor also supports the jury's likelihood of confusion finding.

### iv.        There Is Unrebutted Record Evidence Of Actual Confusion

Despite numerous instances of actual confusion in the trial record,[12] LCC continues to falsely assert that there is "no evidence of actual confusion." *Compare* Motion at 22 *with* Dkt. 215, May 26 Tr. Trans. at 112:1-19; Dkt. 217, May 27 Tr. Trans. at 285:2-23; *id.* at 320:16-322:5; *id.* at 364:16-367:23; Dkt. 219, May 31 Tr. Trans. at 401:4-404:15 (testimony as to actual confusion). This is particularly surprising in view of LCC's own corporate representative's testimony regarding a known instance of confusion. *See* Dkt. 215, May 26 Tr. Trans. at 112:1-19. The evidence of actual confusion strongly supports the jury's likelihood of confusion determination. Indeed, it is well established that "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d. Cir. 2004) (citing *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)). "Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Id.*

### v.        LCC Adopted The Infringing LEXINGTON Marks In Bad Faith

LCC's bad faith adoption of the infringing LEXINGTON marks is well-documented. LCC was unquestionably aware of Lexington and its trademarks before LCC ever entered the U.S. market. *See* Dkt. 215, May 26 Tr. Trans. at 67:24-68:20. LCC was also aware of Lexington's concern that LCC's use of a LEXINGTON-formative mark would cause consumer confusion in the U.S. *See id.* at 68:21-70:12. LCC knew that the TTAB had canceled its LEXINGTON Flag Logo for use in connection with home textiles. *See id.* at 64:5-67:9. Finally, despite agreeing, before it ever entered the U.S. market, to use LEXINGTON only where LEXINGTON

---

[12] *See, e.g.*, Dkt. 215, May 26 Tr. Trans. at 112:1-19; Dkt. 217, May 27 Tr. Trans. at 285:2-23; *id.* at 320:16-322:5; *id.* at 364:16-367:23; Dkt. 219, May 31 Tr. Trans. at 401:4-404:15.

CLOTHING COMPANY was the primary identifier, LCC ignored its agreed-upon restrictions and has progressively encroached upon Lexington's rights. LCC did this despite admitting at trial that the stated purpose of the settlement agreement was "to eliminate potential confusion." *See* Dkt. 215, May 27 Tr. Trans. at 71:25-72:10 (discussing PX-AC).

Moreover, the record reflects not only that LCC ignored its contractual obligations, but that it actively attempted to conceal its infringing activities. Indeed, when Lexington discovered LCC's infringement and sent LCC a cease and desist letter in 2019, LCC responded by misrepresenting its U.S. advertising activities in order to claim compliance with the settlement agreement. *See* Dkt. 217, May 27 Tr. Trans. at 259:12-268:13; *id.* at 270:4-275:21. Furthermore, there is evidence that LCC knew it could block U.S. visitors to its social media accounts, on which LCC used infringing marks, but chose not to do so. *See* Dkt. 215, May 26 Tr. Trans. at 89:22-90:4. Finally, there is evidence that LCC advertised and offered to sell (and likely did sell) pillows on which LCC claimed to own a "U.S. Registered TM" for LEXINGTON COMPANY, even though LCC owns no such trademark for pillows or bedding of any sort. *See* Dkt. 219, May 31 Tr. Trans. at 416:20-418:1 (discussing PX-JN). "Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 389 (2d Cir. 2005); *see also* Dkt. 221, June 1 Tr. Trans. at 623:12-18. In view of this trial record, LCC's claim that there is "no admissible evidence of bad faith on the part of LCC" rings hollow.

### vi.     The Parties Offer Products of Comparable Quality and Target Similar Customers

LCC admits that the parties' "respective products are of comparable quality." *See* Motion at 24. This can increase the likelihood of confusion. *See, e.g.*, *Morningside Grp.*, 182 F.3d at 142. LCC further acknowledges that both parties' customers are "affluent." *See* Motion at 25 (citations omitted). Rather than addressing the objectively reasonable conclusion that these affluent

customers would purchase LCC's infringing products—such as pillows, bedding, and other home goods—without great care, LCC instead focuses on irrelevant products: LCC's clothing. *See id.* at 25. The record reflects infringing LCC's goods that are inexpensive, particularly to LCC's affluent target audience. *See, e.g.*, PX-CS (infringing pillowcase sold for $40); PX-OT (infringing pillows and pillow covers sold for $29 to $89). This further supports the jury's determination on likelihood of confusion. *See Life Indus. Corp. v. Star Brite Distrib., Inc.*, 31 F.3d 42, 45 (2d Cir. 1994) (consumers are "unlikely to exercise care" in purchasing inexpensive products); *Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*, 857 F.2d 80, 83 (2d Cir. 1988) (noting that inexpensive products may be bought "on impulse or oral recommendation"); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 326-27 (S.D.N.Y. 2000) (noting that "people generally exercise greater care in purchasing expensive products than in purchasing cheap products"). These facts further support the jury's likelihood of confusion finding.

## III.   CONCLUSION

The relief sought by LCC is inappropriate for a Rule 59(e) motion. Even if the Court were to entertain the Motion, LCC's arguments are contrary to the law, inconsistent with the trial record, and fall far short of satisfying the heavy burden required to justify disturbing the jury's verdict. After consenting to a jury trial, LCC cannot now—after an adverse verdict—claim that the jury was merely advisory. Nor can LCC legitimately argue that the jury's damages award was erroneous. To the contrary, the jury's verdict is well-supported by the trial record and should not be disturbed. The Court therefore should deny LCC's Motion in its entirety.

Dated:  July 14, 2022

Respectfully submitted,

**MCGUIREWOODS LLP**

  /s/ Lucy Jewett Wheatley
Lucy Jewett Wheatley (*pro hac vice*)
lwheatley@mcguirewoods.com
Amanda L. DeFord (*pro hac vice*)
adeford@mcguirewoods.com
800 East Canal Street
Gateway Plaza
Richmond, VA 23219
Tel:  (804) 775-1000
Fax:  (804) 775-1061

Michael L. Simes
msimes@mcguirewoods.com
1251 Avenue of the Americas, 20th Floor
New York, NY 10020
Tel:  (212) 548-2167
Fax:  (212) 715-6275

Matthew W. Cornelia (*pro hac vice*)
mcornelia@mcguirewoods.com
2000 McKinney Avenue, Suite 1400
Dallas, TX 75201
Tel:  (214) 932-6400
Fax:  (214) 932-6499

*Counsel for Plaintiff Lexington Furniture
Industries, Inc. d/b/a Lexington Home Brands*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by the Court's

CM/ECF system on July 14, 2022, as follows:


Craig M. Flanders (CF2009)
**Blank Rome LLP**
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
cflanders@blankrome.com

Timothy D. Pecsenye
Samar Aryani-Sabet
Blake Fink
**Blank Rome LLP**
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
9215) 569-5500
pecsenye@blankrome.com
saryani-sabet@blankrome.com
bfink@blankrome.com


*/s/ Lucy Jewett Wheatley*
Lucy Jewett Wheatley