UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LEXINGTON FURNITURE INDUSTRIES,
INC. d/b/a LEXINGTON HOME BRANDS,

                      Plaintiff,                          19-cv-6239 (PKC)

      -against-                                   OPINION
                                                                AND ORDER

THE LEXINGTON COMPANY, AB d/b/a
THE LEXINGTON CLOTHING
COMPANY,

                      Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff Lexington Furniture Industries, Inc. ("LFI") prevailed at trial in its action against defendant The Lexington Company, AB ("LCC") asserting Lanham Act and state law breach of contract and unfair competition claims. The Court denied LCC's post-trial motions. (Opinion and Order of October 24, 2022 (ECF 258).) LFI has moved for an award of attorneys' fees and expenses against LCC on the ground that this is an "exceptional case."

        Separately, in a letter filed on January 19, 2023, (ECF 266), LFI asserted that LCC had violated the Court's Permanent Injunction. Following a February 2, 2023 conference with the parties, the Court issued an Order to show cause why LCC ought not be held in contempt of Court for violation of the Orders of October 24, 2022, (ECF 258), and December 22, 2022, (ECF 264), and set a hearing for February 6, 2023. At the hearing, LFI called three witnesses and LCC called none.

For reasons that will be explained, the Court finds LCC to be in contempt of Court for violation of the Order of December 22, 2022. It also finds that this action is not an exceptional case and denies LFI's application for attorney's fees.

FINDINGS OF FACT

Based upon the prior proceedings in this action and the record presented at the February 6, 2023 hearing, the Court finds as follows:

1. The action was commenced on July 8, 2019. LFI alleged that, despite its corporate name, it was more than a furniture company and was a "global leader in the design, sourcing, manufacturing, and lifestyle marketing of upscale home furnishings." (ECF 1 ¶ 3.) It alleged that LCC was more than a clothing company and sold bed linen and other home products. (See id. ¶ 8.)

2. In or about 2004, LCC successfully registered the name "Lexington" in connection with bed linen and associated products. (Id.) LFI brought and prevailed in a proceeding before the United States Patent and Trademark Office ("USPTO") in which it sought to cancel LCC's registrations. (Id. ¶¶ 10-11.) A three-judge panel of the Trademark Trial and Appeal Board found that "because the marks are similar, the goods are related and the goods move in the same channels of trade and are sold to the same classes of consumers, applicant's mark LEXINGTON and design for household linens so resembles petitioner's LEXINGTON marks for furniture as to be likely to cause confusion." (ECF 1, Ex. 6 at 28.) LCC appealed to the Federal Circuit. (ECF 1 ¶ 13.)

3. While the appeal was pending, on January 12, 2012, the parties entered into a settlement agreement (the "Settlement Agreement") that permitted LCC to

engage in some uses of the mark, provided it was accompanied by LCC's flag logo. Based upon the Settlement Agreement, the parties agreed to dismissal of the appeal to the Federal Circuit, and it was dismissed on May 23, 2012. (ECF 87, Ex. 21.)

4. In this action, LFI alleged that LCC breached that Settlement Agreement, willfully violated its trademarks and engaged in state law unfair competition.

5. A jury was empaneled on May 26, 2022. On June 2, 2022, the jury returned a verdict finding in favor of LFI on the Lanham Act claim and implicitly on the state law unfair competition claim. (ECF 212.) The jury found that LCC's Lanham Act violation was willful. (Id.) It awarded LFI damages as follows: $1.00 in nominal damages on the claimed breach of the Settlement Agreement, $1,641,963 in disgorgement of profits on the Lanham Act claim, and $925,000 in punitive damages on the state law unfair competition claim. (Id.)

6. On June 23, 2022, LFI moved for entry of a permanent injunction. (ECF 234.) In connection with the motion, it submitted a comprehensive proposed Order granting permanent injunctive relief. (ECF 237.) In its Opinion and Order of October 24, 2022, the Court concluded that LFI had met the standards for permanent injunctive relief. It also found that "[t]he permanent injunction appropriately enjoins LCC's use of Lexington-formative marks, including the flag logo and 'Lexington Clothing Company,' in the future" and that it is "also appropriately tailored in scope." (ECF 258 at 24.) It expressly determined that "LFI's motion for a permanent injunction (Doc 234) is GRANTED." (Id.)

7. The Opinion and Order of October 24, 2022, also denied LCC's motion to amend or alter the judgment with respect to the Lanham Act claim and the

punitive damage award on the state law unfair competition claim. LCC made no motion directed to the breach of the Settlement Agreement. LCC filed a notice of appeal on November 22, 2022, from the judgment and from the Court's Opinion and Order of October 24, 2022, including, specifically, the grant of a permanent injunction. (ECF 262.)

8.      On December 22, 2022, at the request of LFI and without further objection from LCC, the Court entered a separate order captioned "Permanent Injunction." (ECF 264.) Among other things, the Permanent Injunction prohibited LCC (and other defined persons) from "[a]ny and all use of LEXINGTON, or a mark confusingly similar thereto, alone or in conjunction with other elements, in connection with Home Goods, sold in or directed to the United States . . . ." (Id. at 2.) In addition to defining "Home Goods," it expressly included within the scope "online" and "email" promotional activities for Home Goods using the name Lexington. (Id. at 2-3.) In general terms, it required LCC to block all U.S.-based users from social media accounts that promoted Home Goods with the name Lexington. Instagram was among the social media accounts mentioned. (Id. at 3-4.)

9.      On January 19, 2023, LFI submitted a letter with exhibits supporting its claim that LCC was in violation of the Court's Permanent Injunction. (ECF 266.) The exhibits appeared to demonstrate violations of the injunction as of January 17, 2023.

10.     LCC responded on January 24, 2023, asserting that it was fully compliant with the Permanent Injunction. (ECF 268.) For example, it stated that:

> A basic search of the websites that Plaintiff cited from a computer in the United States demonstrates Defendant's compliance – i.e., they are not accessible. See Exhibit A attached hereto for true and correct copies of screenshots reflecting searches of all eighteen (18) cited websites showing they are all inaccessible to users within the United States. Despite Plaintiff's allegations, the foregoing efforts have effectively blocked all individuals from accessing its websites from

>within the United States. Simply put, Defendant has complied with the Order.

The artful submission avoided addressing the state of compliance on the dates cited in the exhibits submitted by LFI.

11. The Court ordered a conference for February 2, 2023, and after hearing counsel, it ordered a contempt hearing for February 6, 2023.

12. The Court also entered an Order as follows:

>Let the defendant The Lexington Company show cause at a hearing to be held at 2 p.m. on February 6, 2023 in Courtroom 11D of 500 Pearl Street why it should not be held in contempt of court for violating the Orders of this Court, specifically the Opinion and Order of October 24, 2022 and the Order of December 22, 2022, in the manner detailed in the letter of counsel for plaintiff dated January 18, 2023 and the exhibits thereto and filed with the Court on January 19, 2023.

(Order of February 3, 2023 (ECF 272).)

13. At the hearing, LFI called as a witness Michael Yarborough, who serves as digital marketing director of LFI's Lexington Home Brands. (Hearing Tr. 2-3.) Yarborough had testified at the 2022 trial that he had signed up, from a U.S.-based location, for LCC emails that promoted LCC home products. At the hearing, he testified that he continued to receive the emails after the jury's verdict and after the Court's Opinion and Order of October 24, 2022, granting the requested permanent injunction. He received an email from LCC sent to his U.S.-based email address as recently as January 15, 2023. (Hearing Tr. 3-6; Ex. 1.) The email reflects a 2023 copyright date and promotes home products under the Lexington name. (Ex. 1.)

14. Yarborough also authenticated other emails from LCC from November 1, 2022, through January 22, 2023. (Hearing Tr. 6-8; Ex. 2.) He testified that

5

he received around two or three emails per week and they promoted the sale of LCC's home products with the Lexington mark.  The email sent by LCC on January 22, 2023, to a U.S.-based email address promoted home products with the name Lexington.  (Ex. 2 at 22-24.)

15. As head of digital marketing, Yarborough testified that, depending on the settings an Instagram user employed, he could see who the user followed.  (Hearing Tr. 13.)  He identified three U.S.-based Instagram users, all in the interior design business, who were following LCC.  He could not say how many of LCC's 64,000 worldwide followers were based in the U.S. because of individual privacy settings.  (Hearing Tr. 16-21.)

16. Yarborough also testified to the existence of four third-party websites selling LCC Home Goods with the Lexington name that were accessible to U.S.-based purchasers and products that could be purchased for shipment within the U.S.  (Hearing Tr. 21-28.)  Screenshots for the websites were available as of February 3, 2023.  (Exs. 5-8.)  Yarborough ordered an item of LCC Home Goods, a pillow, to be shipped to his U.S. work address on February 3, 2023, from royaldesigns.com.  (Ex. 9.)

17. The websites prominently feature LCC's flag logo with the Lexington name in promoting and selling LCC's Home Goods.  The fact that these websites are openly promoting and selling a variety of Lexington Home Goods to U.S. consumers more than 6 months after the jury's verdict and three months after the Opinion and Order of October 24, 2022, permits the reasonable inference the activities of these third-party vendors are undertaken with the knowledge, acquiescence and support of LCC.

6

18.     Jillian Powell, a paralegal at McGuire Woods LLP, testified at the hearing.  She authenticated a letter of October 25, 2022, from one of LFI's trial lawyers to LCC's lead trial lawyer after the Court ruled on the post-trial motions and granted the motion for a permanent injunction.  (Hearing Tr. 36; Ex. 10.)  In that letter LFI advised LCC that "LCC must also block individuals in the United States from accessing any LCC website using 'LEXINGTON' in the domain, title, header, footer, or content of the website, including the <lexingtoncompany.com> website.  LCC must also block individuals in the United States from accessing LCC's social media accounting, including Facebook, Instagram, Pinterest, Vimeo, YouTube, TikTok, and Twitter."  (Ex. 10.)  The letter asked LCC to confirm that LCC will pay the judgment and cease its infringing conduct.

19.     LCC responded by letter of November 4, 2022, noting that it had not yet filed a notice of appeal, that enforcement of the money judgment was stayed for 30 days after its entry, and that the proposed injunction had not been entered but "[e]ven if the Court's October 24 order can be construed as entry of the proposed permanent injunction, the proposed permanent injunction provides our client 30 days to come into compliance." (Ex. 11.)

20.     Powell testified that a record search demonstrated that as of December 8, 2022, the "registrar" for the domain name lexingtoncompany.com was CSC Corporate Domains, Inc. located in Wilmington, Delaware.  (Hearing Tr. 40-41.)  As of December 13, 2022, the "registrar" was transferred to Ascio, Inc. headquartered in Canada and Denmark.  A reasonable inference to be drawn from the change was that if it became necessary for LFI to obtain relief against the registrar, it would face the additional hurdles of serving and prosecuting a claim against a non-U.S. based entity.

21. Powell also testified that she visited the website lexingtoncompany.com on January 17, 2023, from her office in Dallas, Texas, on her work computer. (Hearing Tr. 42-43.) The screenshots indicated in the upper right-hand corner "US/EN," likely meaning U.S. and English language. (Ex. 13.) The lexingtoncompany.com site utilized the Lexington name and advertised Home Goods items such as pillow covers and cases.

22. On January 17, 2023, Powell also signed up for a newsletter from LCC by going to the lexingtoncompany.com website and clicking the newsletter tab. (Hearing Tr. at 44-46.) She signed up from the newsletters—marketing emails—while in the United States and did nothing to disguise or conceal her location. The marketing material she received including an entire bedding set and the emails bore the word Lexington with the flag logo. (Tr. 46-47; Ex. 14.) She also testified that she received an additional email on January 22, 2023, with the Lexington name and flag and promoting a bedding set and some home goods. (Tr. 47-48; Ex. 15.)

23. Powell also authenticated emails sent to the email account of Amanda DeFord, one of the trial lawyers for LFI, between January 25, 2023, and February 2, 2023, from an address at lexingtoncompany.com with the Lexington name and flag logo promoting the sale of pillowcases, pillow covers and duvet covers with pictures of bedding. (Hearing Tr. 48-49; Ex. 16.) One of the emails had the headings "Explore Bedding" and "Explore Towels." (Ex. 16 at 14.)

24. Powell identified a series of social media screenshots of U.S-based users that follow LCC through Instagram, Twitter, or Pinterest. (Tr. 49-52; Ex. 17.) She

took the screenshots on January 17, 2023.  (Id.)  This demonstrated the ability of U.S. persons to access LCC's promotional material in the U.S.

25. Clifton Folkerts, who works at McGuire Woods as network architect for the IT infrastructure, testified that a McGuire Woods laptop accessing the internet would display an IP address that a geolocation database would show was located in the U.S.  (Hearing Tr. 56-59.)  He further testified that he has blocked persons from certain countries from accessing a specific website and that the process takes between less than four hours to less than a day.  (Id. at 59.)

26. After LFI rested its case at the contempt hearing, LCC called no witness but offered a declaration from Pooyo Jalali, CEO of the Lexington Company, AB.  (Hearing Tr. 61.)  Jalali was not present in the courtroom.  No request was made to permit Jalali to testify by simultaneous transmission pursuant to Rule 43(a), Fed. R. Civ. P., which would have required a showing of good cause.

27. LCC argued that the declaration was a required filing under the Permanent Injunction.  (Hearing Tr. 61; ECF 264 at ¶ 5.)  LCC argued that it demonstrates its compliance with the injunction.  There are two problems with the argument.  First, had LFI charged LCC with non-compliance with paragraph 5 of the Permanent Injunction—the filing requirement—the declaration would be probative evidence.  But in the context of a contempt hearing premised on violations of provisions other than paragraph 5, it is not admissible evidence of the truth of the statements therein because it is an out of court statement offered for the truth of its contents.  The second problem is one that may accurately be described as ironic.  To demonstrate compliance with the Permanent Injunction, LCC tenders a declaration that was filed out of compliance with the Permanent

9

Injunction. By LCC's own admission, the declaration was due to be filed by January 26, 2023, but was not filed until February 6, 2023, the date of commencement of the contempt hearing. (Hearing Tr. 63.) The conclusory statements in the declaration fail to rebut the specific evidence offered by LFI at the hearing.

28. "A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply." N.Y. State National Organization for Women v. Terry, 886 F.2d 1339, 1351 (2d Cir. 1989) (citing EEOC v. Local 638, Local 28 of Sheet Metal Workers' International Association, 753 F.2d 1172, 1178 (2d Cir. 1985), aff'd, 478 U.S. 421 (1986)). "It need not be established that the violation was willful." Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies, Inc., 369 F.3d 645, 655 (2d Cir. 2004) (citing Donovan v. Sovereign Security Ltd., 726 F.2d 55, 59 (2d Cir. 1984)).

29. The Permanent Injunction was a clear and unambiguous order with clearly defined terms. "Fed. R. Civ. P. 65(d) requires that injunctive orders be 'specific in terms' and 'describe in reasonable detail . . . the act or acts sought to be restrained.' The Rule was intended to prevent an uncertain or vague decree from becoming the basis for a contempt citation." Terry, 886 F.2d at 1351-52 (citing Schmidt v. Lessard, 414 U.S. 473, 476 (1974) (per curiam)). "To comply with the specificity and clarity requirements, an injunction must 'be specific and definite enough to apprise those within its scope of the conduct that is being proscribed.'" Id. (quoting In re Baldwin-United Corp., 770 F.2d 328, 339 (2d Cir. 1985)).

30. The Court finds that the permanent injunction tendered by LFI came into effect on October 24, 2022, when the Court approved its form and granted LFI's motion. To avoid doubt, however, this Court bases its findings on the issue of contempt solely on LCC's failure to comply with the Permanent Injunction separately entered on December 22, 2022, which required LCC to bring itself into compliance within 21 days, i.e., by January 12, 2023. It could have come as no surprise to LCC as to what would be required because the Court had approved the form of the permanent injunction on October 24, 2022. LCC had ample time to plan for compliance but failed to do so.

31. The Permanent Injunction entered on December 22, 2022, applied to LCC and any companies owned or controlled by it as well as an array of affiliated persons or entities. (ECF 264 ¶ 1.) It defined "Home Goods" as "furnishings, textiles and decor," including a list with numerous examples. (Id. ¶ 2.) It enjoined "[a]ny and all use of LEXINGTON, or a mark confusingly similar thereto, alone or in conjunction with other elements, in connection with Home Goods, sold in or directed to the United States," including a list of four comprehensive categories of activities covered by the injunction. (Id. ¶ 3(a).) It identified with considerable precision four affirmative steps that LCC was required to take. (Id. ¶ 4.)

32. LCC has advanced no credible claim of confusion as to the meaning of any of term of the Permanent Injunction.

33. LFI proved by clear and convincing evidence that LCC violated the terms of the Permanent Injunction by (1) "offering to sell . . . through third party physical, digital or virtual marketplaces . . . Home Goods that bear any form of the LEXINGTON mark" in violation of paragraph 3(a)(i)&(ii); (2) "[u]sing any form of the LEXINGTON

mark in connection with advertising in any current or future form for Home Goods in the United States or directed to United States customers, including but not limited to online, . . . email . . . [or] promotional . . . activities, or other forms of advertising, marketing or promotion in any format" in violation of paragraph 3(a)(iii).

34. LFI also proved by clear and convincing evidence that LCC failed to take the following affirmative steps required by the injunction: (1) "[w]ith respect to websites controlled by the Enjoined Parties which use a LEXINGTON mark in the domain, title, header, footer, or content of the website (including but not limited to lexingtoncompany.com) and which advertise, promote, offer to sell, or sell Home Goods, the Enjoined Parties shall block all access by individuals located within the United States to such websites" in violation of paragraph 4(a); and (2) "[w]ith respect to current or future social media, digital or virtual accounts controlled by the Enjoined Parties which use a LEXINGTON mark and promote or feature Home Goods (including, but not limited to, Defendant's Facebook, Instagram, Pinterest, Vimeo, YouTube, TikTok and Twitter accounts), the Enjoined Parties shall block or restrict all access by individuals located within the United States[ and to]o the extent individuals located within the United States cannot be blocked from one or more of these social media, digital or virtual accounts, the Enjoined Parties shall block or restrict all U.S.-based followers from accessing or following such account(s)" in violation of paragraph 4(b).

35. LCC has failed to prove a diligent attempt in a reasonable manner to comply with the Permanent Injunction. The burden of proving such an attempt lies with the party claiming it. Paramedics Electromedicina Comercial, 369 F.3d at 656 ("[The alleged contemnor] has not demonstrated a diligent attempt to comply with the district

court's orders in a reasonable manner."). At most there is evidence that LCC endeavored in some respect to comply with the Permanent Injunction. That falls short of demonstrating a diligent attempt in a reasonable manner.

36. The Court finds by clear and convincing evidence LCC to be in violation of the Permanent Injunction and in contempt of this Court.

37. "Generally, the sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance." Vuitton et Fils S. A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979). In this case, LFI has not endeavored to prove damages for past noncompliance. The Court will fashion a remedy to coerce future compliance. A district court is vested with wide discretion to fashion such a remedy. Id.

38. The Court will allow LCC a brief period to bring itself into full and complete compliance with the Permanent Injunction following which it will set an amount per day. LFI suggested the modest sum of $500 per day, (Hearing Tr. 75), which the Court accepts.

39. LCC shall bring itself into full compliance with the Court's Permanent Injunction within 10 days of this Order. Thereafter, it shall be liable to pay the sum of $500 per day until it brings itself into full compliance. The Court reserves the right to increase the coercive remedy if there are any further violations after 30 days from the date of this Order.

40. With respect to remedying past non-compliance, LFI has not endeavored to demonstrate out of pocket damages, lost sales or lost profits and none are awarded.

41. The Court will award LFI its reasonable attorneys' fees and costs in pursuing the remedy of contempt. The Second Circuit has clarified that a finding of willfulness is not essential to an award of attorneys' fees and costs for a finding of contempt. See Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996). Here the Court comfortably concludes that LCC's actions were willful. The basis for the Court's conclusion is premised upon the background to the litigation and the extended period that LCC had for bringing itself into compliance.

42. In 2004, LCC successfully registered the name "Lexington" in connection with bed linen and associated products. Thereafter, LFI brought and prevailed in a cancellation proceeding before the USPTO in which it sought to cancel LCC's registrations. LCC appealed to the Federal Circuit. On January 12, 2012, while the appeal was pending, the parties entered into the Settlement Agreement that permitted LCC to engage in some uses of the mark provided it was accompanied by LCC's flag logo. LFI alleged in this action that LCC breached the Settlement Agreement. On June 2, 2022, the jury found that LFI had breached the Settlement Agreement. (ECF 212.)

43. The June 2 jury verdict also found against LCC on the Lanham Act claim and thereby necessarily on the state law unfair competition claim. The jury further found that the Lanham Act violation was "willful" and that punitive damages were warranted on the state law unfair competition claim.

44. At the time of the June 2 verdict, LFI stated on the record that it would be seeking a permanent injunction. (June 2, 2022 Tr. at 676.) LCC knew that LFI had sought in its First Amended Complaint a permanent injunction against "using in any manner, including but not limited to as a mark, trade name, hashtag, domain name, social

media account, 'LEXINGTON,' 'LEXINGTON COMPANY,' the LEXINTON & Design Mark, and any other use of LEXINGTON that is confusingly similar to the LEXINGTON Marks in connection with home goods, home furnishings, home textiles, and related goods in the United States. . . ." (ECF 45 at Prayer For Relief ¶ (a)(i).)

45. LCC had the exact text of LFI's proposed injunction in hand as of June 23, 2022. (ECF 237.)

46. As noted above, the Opinion and Order of October 24, 2022, denying LCC's motion examined the text of the proposed injunction and found that it was narrowly tailored to fit the specific legal violations and did not impose unnecessary burdens on lawful activity. (ECF 258 at 24.) It specifically found that "[t]he proposed injunction is also appropriately tailored in scope," and it stated that "LFI's proposed permanent injunction will be granted." (Id.) In the conclusion, it stated that "LFI's motion for a permanent injunction (Doc 234) is GRANTED." (Id.)

47. Despite the Opinion and Order of October 24, 2022, LCC did not bring itself into compliance with the terms of the proposed permanent injunction.

48. This necessitated a letter to the Court from LFI asserting that LCC had been on notice that it was violating the permanent injunction since October 28, 2022, but continued to violate the injunction, (ECF 263):

> Despite the Court's Order granting Lexington's proposed permanent injunction, Defendant The Lexington Company, AB d/b/a The Lexington Clothing Company ("LCC") has continued to use infringing Lexington-formative marks in connection with, at least, marketing emails sent to individuals in the United States and on LCC's U.S.-facing website.
>
> Lexington sought LCC's compliance with the terms of the permanent injunction by letter dated October 28. Receiving no response, Lexington followed up by email on November 2. In

response, LCC suggested that, notwithstanding the Court's Order (Dkt. 258), the Court had not formally entered an injunction, and that LCC was therefore not obligated to comply.

49. The Court then entered a separate order denominated "Permanent Injunction" on December 22, 2022. (ECF 264.) The Court has only considered conduct occurring after its 21-day period for compliance in its finding of contempt.

50. The long advance notice that LCC had to prepare to bring itself into compliance with the Permanent Injunction and its failure to do so lead this Court to find that LCC's violation of the injunction was willful.

51. "[A] district court, having found willful contempt, would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt." Weitzman v. Stein, 98 F.3d 717, 719 (2d Cir. 1996). The Court finds that there are no persuasive reasons not to award attorneys' fees and costs to LFI as against LCC and does so.

52. The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees." 15 U.S.C. § 1117(a). The Second Circuit has held that the standard applied under a like-worded statute for the award of attorney's fees in "exceptional" patent cases applies to Lanham Act cases. Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 522 (2d Cir. 2018).

53. In Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545 (2014), the United States Supreme Court construed the "exceptional" case standard for patent cases. It held "that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was

litigated." Id. at 554.  The determination of exceptionalness should be made by district courts "in the case-by-case exercise of their discretion, considering the totality of the circumstances." Id.  The factors that a court may consider include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Id. at 554 n.6 (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)).  The Second Circuit has noted there is no presumption that an action in which the fact-finder has found willful infringement is necessarily "exceptional." 4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202, 216 (2d Cir. 2019).

54. LFI argues that the case is exceptional based on the weakness of LCC's position on the facts and the law and also on its litigation conduct.  While the prior proceedings are addressed in the Court's prior opinions, some points are worthy of noting.

55. The action was commenced on July 8, 2019.  LFI alleged that, despite its corporate name, it was more than a furniture company and was a leader in the "design, sourcing, manufacturing, and lifestyle marketing of upscale home furnishings." (ECF 1 ¶ 3.)  It alleged that LCC was more than a clothing company and sold bed linen and other home products.  (See id. ¶ 8.)

56. LFI served process on LCC on July 9, 2019.  Without seeking an adjournment of its time to answer, LCC filed its answer and counterclaims on July 30, 2019.  LFI raised issues concerning the efficacy of LCC's counterclaim and LCC amended its answer and counterclaim within 14 days of the Court's Order to do so.  The Court warned LCC that it should consider its Rule 11 obligations in regard to the counterclaim alleging that LFI breached the Settlement Agreement by disclosing in its pleading the

conduct that LFI alleged to be a breach. (ECF 40.) The Court granted LFI the opportunity to amend its complaint and, in response to the amended pleading, LCC refrained from asserting the counterclaim in its newly filed answer.

57. During the discovery period, the parties traded contentions of failures to comply with discovery obligations that required intervention of the Court. (See Orders of Nov. 27, 2019 (ECF 50); Feb. 20, 2020 (ECF 65).) No sanctions were imposed on either side.

58. After discovery was concluded, each side moved for summary judgment. The Court denied LFI's motion and granted LCC's motion only insofar as it related to certain sales through a third-party online retailer. (Opinion and Order of Mar. 23, 2021 (ECF 115).) In its submissions, LCC identified 68 third-party trademark registrations incorporating the word "Lexington." (Id. at 15.) Notably, the Court concluded that "a reasonable jury could reach different conclusions regarding the similarity of the marks" and "reasonable juries could reach different conclusions on 'the ultimate issue of whether [LCC's] action generated a likelihood of customer confusion.'" (Id. at 17, 19 (alteration in original).)

59. The action proceeded to trial on May 26, 2022, the parties rested after three days and jury deliberations were concluded by June 2, 2022. The trial was unremarkable. Following the verdict, the parties stipulated to a schedule on post-trial motions. LCC's motion was fully briefed by July 21, 2022, and decided on October 24, 2022.

60. The Court concludes that there was nothing "exceptional" about the reasonableness of the manner in which LCC litigated the case. The case was hard fought,

but the lawyers for each side were professional and no recognized norms were violated in the conduct of the case.

62. Nor does the Court find anything exceptional in the legal or factual strength of LCC's litigation position. Following the jury's verdict, LCC had the legitimate right to move the Court for judgment as a matter of law. Its positions on the post-verdict motion were reasonably focused. It argued that, as a matter of law, the evidence did not support a finding of consumer confusion the jury's ruling on disgorgement was advisory, that LFI's claims were barred by the doctrine of laches, and that LFI was not entitled to punitive damages as a matter of law. The Court, for reasons explained in its 24-page ruling, rejected each of these arguments. (Opinion and Order of October 24, 2022 (ECF 258).) Notably, the Court concluded that "a reasonable jury could conclude that there was a likelihood of consumer confusion based on the trial evidence," that the jury's finding of willful infringement foreclosed the laches defense, that LCC forfeited any right it may have had to have the disgorgement remedy tried to the Court, and that the jury was permitted to consider the question of punitive damages. (Id. at 3, 6, 8, 10, 12, 16.)

62. The jury's well-supported awards of disgorgement and punitive damages are permissible considerations in the total mix of circumstances. Disgorgement is a remedy that LFI was able to obtain only because of the jury's finding of willfulness. See International Star Class Yacht Racing Association v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 72 (2d Cir. 1998); W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir. 1970). In addition to disgorgement, the jury awarded punitive damages on LFI's unfair competition claim, the state law analogue to its Lanham Act claim. The jury's award of

19

disgorgement and punitive damages mitigates the need for additional compensation or deterrence.

63. Viewing the totality of circumstances, the Court concludes that the case is not "exceptional" within the meaning of 15 U.S.C. § 1117(a). LFI's motion, (ECF 230), is DENIED.

64. Separately, LFI has moved for the imposition of taxable costs. (ECF 228.) In the exercise of discretion, the application is DENIED without prejudice to renewal within 30 days of the issuance of the mandate by the Second Circuit on the pending appeal. The renewed application for the taxation of costs should be made by "Notice of Taxation of Costs," filed on ECF but directed to the Clerk of Court as required by Local Civil Rule 54.1.

65. LFI may submit its application for attorneys' fees and costs premised upon the finding of willful contempt of the permanent injunction within 21 days of this Order.

66. Commencing 10 days from the date of this Order, any further violation of the permanent injunction by LCC will result in a coercive penalty of $500 per day.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
         March 30, 2023